Barry C. HIXON

v.

John DURBIN, et al.

Civ. A. No. 82–708.

United States District Court,
E.D. Pennsylvania.

March 31, 1983.

■■■■■■■■■■■■■

Harold R. Berk, Philadelphia, Pa., and Mark Widoff, Camp Hill, Pa., for plaintiff.

John P. Krill, Harrisburg, Pa., for defendants Bartle and Waldman.

John G. Knorr, III, Harrisburg, Pa., for defendant Heddinger.

## MEMORANDUM

NEWCOMER, District Judge.

Before the court are several summary judgment motions in this civil rights and diversity action, which arose out of a dispute over a state employment contract. Defendants Harvey Bartle, III and Jay Waldman move for summary judgment on plaintiff's sole remaining claim against them, which is a claim of deprivation of a property interest without due process of law in violation of 42 U.S.C. § 1983. Plaintiff has filed a cross-motion for partial summary judgment on the issue of liability against defendants Bartle and Waldman. Also, defendant Fred Heddinger moves for summary judgment on the two remaining claims against him, state-law claims of interference with prospective contractual relations and defamation. All other claims set forth in the complaint, including all claims against defendant John Durbin, have been dismissed either by my order of July 27, 1982, 545 F.Supp. 231, or by stipulation of the parties.[1]

## I. BARTLE AND WALDMAN'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION.

### A. *Undisputed Facts.*

The following statement of undisputed facts is derived from defendants' reply to plaintiff's motion for partial summary judgment, plaintiff's reply memorandum in support of his motion for partial summary judgment, and other submissions of the parties.

1. The complaint in this case was filed on February 17, 1982.

2. The plaintiff is an adult individual named Barry C. Hixon.

3. Mr. Hixon was born on February 28, 1943.

4. Defendant Harvey Bartle, III, on or about June 24, 1980, was the acting Attorney General of the Commonwealth of Pennsylvania. He held the office of Attorney General until January 21, 1981.

5. Defendant Jay C. Waldman is General Counsel of the Commonwealth of Pennsylvania. He has held this office since January 21, 1981.

6. The Pennsylvania Public School Employees' Retirement Board ("the Board") administers the Pennsylvania Public School Employees' Retirement Fund, a multi-billion dollar fund which provides retirement benefits to public school employees in the Commonwealth of Pennsylvania.

7. The members of the Board are subject to 24 Pa.C.S. § 8521(e), which provides:

"The members of the board, employees of the board, and agents thereof shall stand in a fiduciary relationship to the members of the system regarding the investments and disbursements of any of the monies of the fund and shall not profit either directly or indirectly with respect thereto."

8. On September 14, 1964, when he was 21 years old, Mr. Hixon pleaded guilty to criminal charges of burglary, larceny and receiving stolen goods and was sentenced to three years probation.

9. Paragraph 22 of the Complaint alleges in part that plaintiff "became an expert in financial matters, and ultimately became

---

1. Technically still pending before me is the motion of defendants Bartle and Waldman for reconsideration of my denial of their motion to dismiss Count I of the complaint. However, as the motion for reconsideration has been swallowed up by the cross-motions for summary judgment, it will be dismissed as moot.

an Assistant Vice-President of The First National Bank of Pennsylvania."

10. The highest title ever held by Barry Hixon at The First National Bank of Pennsylvania was that of "Municipal and Corporate Services Officer." Mr. Hixon explained at his deposition on November 16, 1982, that just prior to his departure from the Bank to work for the Treasury Department he was nominated to become an Assistant Vice-President, but that the promotion was not made final and formally adopted because he was about to leave the Bank.

11. In December of 1976, on the occasion of the Pennsylvania Society Dinner in New York, Mr. Hixon was offered a job with the Treasury Department of the Commonwealth of Pennsylvania by newly elected State Treasurer Robert E. Casey.

12. Mr. Hixon was subsequently asked to complete a job application form for the Treasury Department. Mr. Hixon's completed job application form falsely stated that he had not previously been convicted of a crime.

13. After working for the Treasury Department, plaintiff went to work for the Board. From June 15, 1978, through June 14, 1980, Mr. Hixon was under contract to the Board "to furnish professional services, of which consultant has unique and special expertise in the area of economics, financial planning and advice. . . . "

14. The contract called for Mr. Hixon to work as an independent contractor and to receive a consultant fee of $46,000 annually, to be paid at a rate of $207.11 per normal work day completed.

15. On September 7, 1979, and again on May 25, 1980, a majority of the Board voted to enter into a proposed new two-year contract with Mr. Hixon as its Investment Coordinator, at an annual compensation of $58,500.00.

16. The proposed new contract was drafted and a copy, unexecuted by the Board Chairmen, John Killian and Barry Hixon, was submitted by the Board to the Office of the Attorney General for approval as to form and legality as required by the Pennsylvania law.

17. The proposed new contract was very similar to Mr. Hixon's first contract with the Board except that his fee was to be $11,900.00 higher and his duties were to be expanded. One of Mr. Hixon's new tasks would have been to manage any monies requested and approved by the Board.

18. Under the proposed new contract, Mr. Hixon would have been responsible for managing billions of dollars of public pension funds.

19. On June 24, 1980, in a letter to John D. Killian, the Chairman of the Board, Attorney General Bartle, disapproved the proposed contract of June 15, 1980, and advised the Board that no contractual relationship existed between the Board and Mr. Hixon.

20. The Attorney General's decision was based on the reasons set forth in the following letter:

"The Department of Justice has reviewed the proposed contract between the Public School Employes Retirement System and Barry C. Hixon. You are hereby advised that I, as Attorney General, disapprove the contract. This disapproval means that no contract relationship between the Commonwealth and Mr. Hixon now exists, the previous two year contract having ended on June 14, 1980.

This Board manages over $4.5 billion in assets for the pensions of current and retired public school employees. Under the Act of October 2, 1975, P.L. 298, No. 96, known as the Public School Employes' Retirement Code, the members of the Board have substantial fiduciary responsibilities as trustees of the Fund (24 P.S. § 8521). Specifically, the members of the Board have a fiduciary relationship to the thousands of current and retired school employes for the Board's actions, including the hiring of professional personnel under contract to the Board. There must be the highest degree of trust maintained between the Board and any professional personnel retained to perform services directly related to those fiduciary responsibilities.

As you may know, Mr. Hixon has a criminal record of burglary and denied the existence of that criminal record while applying for a position with the Commonwealth. You proposed to pay Mr. Hixon some $58,000 annually for a total of $117,000 over the two-year life of the proposed contract, a sum greater than is paid to any employe of the executive branch of state government except for the Governor.

The Board must exercise and maintain a high degree of care in the hiring of consultants to this sizeable fund which exists for the benefit of those present and past school employees who are its members. As legal advisor to the Board, I must advise you that the Board has not exercised the requisite standard of fiduciary responsibility in retaining Mr. Hixon as a consultant.

It must also be noted that in the past, state government and its various departments and agencies have not always been sensitive to the need to maintain their integrity. Particularly in light of Mr. Hixon's denial of a criminal record, this proposed contract cannot help but undermine the confidence of the public school employes and the citizens of the Commonwealth in the Board and in state government generally.

As Attorney General and as legal advisor to the Board, I must act, pursuant to law, to maintain the public's trust in the Board and its activities."

21. On June 24, 1980, Board Chairman, John Killian, received the Attorney General's letter, consulted with Mr. Hixon and others, issued a press release criticizing the disapproval and obtained a meeting that same day with the Attorney General at which he urged reconsideration. The press release read as follows:

Mr. Bartle's startling announcement fails to consider the fact that the Retirement Board renewed Mr. Hixon's contract because of his record of performance as investment coordinator of the Retirement Fund. The Retirement Board was aware of his record of youthful indiscretion and the circumstances surrounding his entry into State employment. The Board's confidence in Mr. Hixon is based on his proven performance and is not diminished by his background which he has long since lived down.

22. Mr. Hixon was aware of the meeting in advance and considered the Chairman to be acting on his behalf.

23. In February of 1981, after Attorney General Bartle had left office, a majority of the Board again voted to offer a contract to Mr. Hixon similar to the contract that had been sought in 1980.

24. In February of 1981, Senator Edward Howard, Chairman of the Finance Committee of the Senate of Pennsylvania, held a press conference and issued a press release critical of the Board and of Mr. Hixon.

25. The new, unexecuted contract, dated April 1, 1981, was submitted to General Counsel Waldman by the Board for approval as to form and legality.

26. On April 14, 1981, in a letter to Nancy Noonan (then Chairperson of the Board) which was made public at the same time, General Counsel Waldman informed the Board of his refusal to approve the contract. General Counsel Waldman's letter said:

"The Office of General Counsel has completed its review of the consulting contract that you and the Board propose to enter into with Barry C. Hixon. Under the proposed contract, Mr. Hixon would receive $117,000 plus expenses to provide the Board with investment advice over the next two years, and that amount could be further increased as the Board and Mr. Hixon might agree.

This proposed contract is virtually identical to one presented for review to the Office of Attorney General last June. In fulfilling our review responsibility, we must consider the need for the services to be performed, whether the contracting party has demonstrated the capacity and character to perform such services, the adequacy or excessiveness of the compensation to be paid, as well as the need to

maintain public confidence in the competence and integrity of government.

This kind of review should not be conducted in a vacumm. I cannot disregard recent revelations by Senator Ed Howard which bear on Mr. Hixon's capacity to perform. I cannot disregard the fact that Mr. Hixon concealed a criminal record on an application for a State position. I cannot disregard the statements of the Pennsylvania Association of Elementary and Secondary School Principals, the Pennsylvania Association of School Administrators and the Pennsylvania School Boards Association which bear upon the issues of capacity to perform and the need to insure confidence in public institutions. Finally, I cannot disregard the opinion of June 24, 1980 by former Attorney General Bartle which disapproved a similar proposed contract.

I have determined that this proposed contract should not be approved. Accordingly, I am returning it to you without my signature or approval.

27. The proposed contract that was disapproved by General Counsel Waldman never received the approval of the Attorney General, which was also required by Pennsylvania law before a contract could be entered.

## B. *Legal Issues.*

Plaintiff's and defendants Bartle and Waldman's cross-motions for summary judgment on the issue of liability raise four legal issues:

(1) Do the undisputed facts show that plaintiff possessed a property interest protected by the 14th amendment which was adversely affected by defendants' actions?

(2) Did defendants deprive plaintiff of a property interest without due process of law?

(3) Is plaintiff's cause of action barred by the statute of limitations?

(4) Are defendants entitled to summary judgment on the issue of qualified immunity?

### 1. *Property Interest.*

In a recent exposition of "the cryptic and abstract words of the Due Process Clause,"[2] the Supreme Court stated that "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' Once that characteristic is found, the types of interest protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265, 274 (1982) (citations omitted).

There is no question that the substantive benefit Mr. Hixon sought—an employment contract with the Board—would constitute "property" within the meaning of the 14th Amendment. If plaintiff had obtained a completed contract, defendants could not have deprived him of it without according him due process of law. Because of the actions of defendants Bartle and Waldman in refusing to approve the proposed contracts, however, plaintiff never obtained a completed contract. The question presented, then, is whether, at some point in Mr. Hixon's pursuit of the disputed contracts, his interest in obtaining them acquired the characteristics of an entitlement rather than a mere unilateral expectation.

An entitlement may exist with respect to a benefit which is sought but not yet obtained whenever state law limits the exercise of discretion by the state official responsible for conferring the benefit. *Winsett v. McGinnes,* 617 F.2d 996 (3rd Cir.1980) (en banc), *cert. den.,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981); *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981); *Three Rivers Cablevision, Inc. v. City of Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). The precise protected property interest plaintiff claims in this case was the right, or entitlement,

---

**2.** *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265, 273 (1982), quoting *Mullane v. Central Hanover*

*Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).

once the Board exercised its statutory authority to vote to enter into a specific contract with him, to have that proposed contract reviewed according to the procedures mandated by state law and approved if it met the criteria of state law.

It is clear that the Board possessed statutory authority to contract for the services of a financial consultant by virtue of 24 Pa.C.S. § 8502(b), which provides that "[t]he Board shall contract for the services of . . . an investment counselor . . . as it deems advisable." Pursuant to this authority, the Board twice voted to enter into contracts with Mr. Hixon. Proposed contracts were prepared and submitted to defendant Bartle (in the case of the 1980 contract) and to defendant Waldman (in the case of the 1981 contract) for review. While state law gave the defendants the authority to review the respective contracts, it did not give them unlimited discretion to withhold their approval, but rather limited their authority by establishing standards for their review of contracts. *See* 71 Pa.S.A. § 292; 37 Pa.Code § 161.12 (1980) (provisions applicable to defendant Bartle); and 71 Pa.S.A. § 732–301(11) (provision applicable to defendant Waldman). The nature of the standards governing defendants' review of contracts, and the question whether the undisputed facts show that defendants violated those standards in this case, will be discussed later in this memorandum. In deciding whether plaintiff has asserted a property interest protected by the 14th Amendment, it is essential merely to note that state law established limits on defendants' authority to review the contracts at issue.

Under the circumstances, plaintiff possessed a protected property interest in having his proposed, executory contracts, which had been formally voted upon by the Board, reviewed in accordance with state law and approved if they met the requirements of state law. The *Logan* case, *supra,* in which the Supreme Court held that a state-created right of a claimant to use certain adjudicatory procedures to resolve a claim of discrimination constituted a protected property interest, reaffirmed prior case law holding that something as intangible as a cause of action can constitute property within the meaning of the due process clause. Moreover, the Third Circuit Court of Appeals in *Winsett, supra,* established the proposition that state officials violate the due process clause when they go beyond the permissible scope of their discretion, as established by state regulation, in refusing to grant a benefit which, if obtained, would constitute "liberty" (specifically, in denying a prisoner's application to a work release program). The *Winsett* holding may also be stated thus: where state law grants an official authority to confer a benefit which would be entitled to due process protection upon those meeting certain criteria, due process is violated when the official goes beyond those criteria in refusing to confer that right or entitlement on a specific individual. Mr. Hixon, after the Board's formal votes to enter into the proposed contracts with him, was entitled under the holding in *Winsett* to have his contracts approved and finalized if they met the criteria for approval established by state law.

Although the protected interest in *Winsett* was a liberty interest, not a property interest, there is no reason to suppose that the Court of Appeals intended its holding to apply only to cases involving liberty interests. In a well reasoned opinion, Judge Diamond of the Western District of Pennsylvania applied the reasoning of *Winsett* to a property interest case. *Three Rivers Cable-Vision, Inc. v. City of Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). *Accord Duva v. World Boxing Assoc.,* 548 F.Supp. 710 (D.N.J.1982); *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981). *Three Rivers* held that a disappointed bidder for a cable television franchise possessed a protected property interest as the claimant of "the right of the lowest responsible bidder in full compliance with the specifications to be awarded the contract once the City, in fact, decided to make an award. The due process to which one possessing the protected interest was entitled was the non-arbitrary exercise by the City of its discretion in making the award. And

it follows that a deprivation of the substantive benefit (the protected property interest) without the process due is an actionable wrong." 502 F.Supp. at 1131.[3]

The principal to be derived from *Logan, Winsett,* and *Three Rivers* is a simple one. When state law provides that a given benefit which constitutes "property" or "liberty" (*i.e.,* money damages to redress unlawful discrimination, admission into a work-release program, or a cable television franchise) shall be conferred upon those who take the requisite procedural steps and meet the requisite substantive standards, the right of an individual who has taken the requisite procedural steps to have his claim of entitlement to the benefit decided, not arbitrarily, but in accordance with state law, itself constitutes an interest protected by the due process clause. Because the interest does not arise until the individual claiming entitlement to the benefit has taken the requisite procedural steps (i.e., has filed a charge of discrimination with the appropriate agency, or has filed a facially adequate application to a work-release program, or has bid for a contract which a municipality is required to award to the lowest responsible bidder), the class of those entitled to the protection of the due process clause is, in each case, appropriately limited.

In Mr. Hixon's case, there was no law requiring the Board to offer a contract for financial advice to the lowest bidder, but there was a law authorizing the Board to contract for the services of a financial consultant as it deemed advisable. While Mr. Hixon had no protected property interests so long as he was merely seeking a contract with the Board, a protected property interest arose after the Board formally voted, pursuant to its statutory authority, to enter into contracts with him. At that point, Mr. Hixon was entitled to the substantive benefit of those contracts *unless* they contained one or more of the flaws defendants were responsible for detecting in the course of their statutorily mandated review.

#### 2. Due Process Violation.

Plaintiff's claim that he was deprived of due process of law by the actions of defendants Bartle and Waldman is based on his charge that defendants refused to approve his contracts on grounds which exceeded their statutory and regulatory authority. As the Third Circuit noted in *Winsett, supra,* the failure of state officials to make decisions affecting protected interests according to the express criteria governing those decisions constitutes a violation of procedural due process as a deprivation of fundamental fairness. 617 F.2d at 1007–08. *Accord Gibson v. Lynch,* 652 F.2d 348, 360 (3rd Cir.1981). Thus, if the undisputed facts show that defendants refused to approve plaintiff's contracts on grounds which exceeded their statutory and regulatory authority, plaintiff is entitled to partial summary judgment on the issue of liability, unless defendants can establish an affirmative defense. On the other hand, if the undisputed facts show that defendants acted within their authority, they are entitled to summary judgment in their favor. As it is undisputed that defendants' actions were based on the reasons they expressed in writing at the time (see Uncontested Facts Nos. 20 and 26), it may be determined as a matter of law whether their actions exceeded their authority.

Defendant Bartle, as Acting Attorney General, acted pursuant to 71 Pa.S.A. § 292 in reviewing Mr. Hixon's 1980 contract. That statute provided that the Attorney General was to give legal advice to the Board concerning its operations and affairs, but it did not define the scope of the Attorney General's review of contracts. An implementing regulation, 37 Pa.Code § 161.12 (1980), defined the scope of the Attorney General's review of contracts as follows:

"Review of contracts will go to the substance of the contract in addition to the review of the technical sufficiency of

**3.** I note my agreement with Judge Diamond that, under *Winsett,* a protected property interest belongs to one who *claims* to be the party ultimately entitled to a state-conferred benefit under the provisions of state law. *Three Rivers,* 502 F.Supp. at 1131 n. 14.

the execution of the contract. Such review will determine: (1) the existence of statutory or other legal authority of the Commonwealth agency and official to enter into such contract; (2) the legality of the provisions of the contract; (3) the adequate protection of all appropriate rights and remedies of the Commonwealth in the contract; (4) the existence of an appropriation of funds for the contract purpose and of consideration for the Commonwealth; (5) the sufficiency of the form and manner of execution of the contract."

As noted in Uncontested Fact No. 20, defendant Bartle's decision not to approve Mr. Hixon's contract was based on (a) the fact that Mr. Hixon had failed to disclose his criminal conviction when he applied for a job with the Treasury Department in 1976–77; (b) Mr. Bartle's opinion that the Board would breach its fiduciary duty to school employees by offering a two-year contract worth $117,000 and entailing responsibility for management of billions of dollars to an individual with a criminal record who denied the existence of that criminal record while applying for a position with the Commonwealth; and (c) his opinion that implementation of the proposed contract would undermine the public's trust in the Board and its activities. My task at this juncture is not to determine whether defendant Bartle or the Board held the correct view as to Mr. Hixon's fitness to serve as financial consultant to the Board, but rather to determine as a matter of law whether defendant Bartle's reasons for refusing to approve the contract were consistent with the limitations on his authority set forth in 37 Pa.Code § 161.12, *supra.*

There is no question that statutory authority for the proposed contract existed by virtue of 24 Pa.C.S. § 8502(b). Therefore, subsection (1) of 37 Pa.Code § 161.12 is inapplicable. Nor are subsections (4) or (5) in issue with respect to defendant Bartle's decision.

■ Subsection (2) of the regulation provides for review of "the legality of the provisions of the contract." One of the reasons defendant Bartle gave for his decision—his stated opinion that the Board violated its fiduciary obligation to the public school employees by extending a contract to Mr. Hixon—could be interpreted as an expression of the view that the proposed contract was illegal. However, in order for a contract to be illegal, there must be some body of law which either prohibits the entry or performance of all or part of the contract or from which it is demonstrable that entry or performance of the contract would be contrary to a clearly expressed public policy. There is no body of law in Pennsylvania which would make entry or performance of the Board's proposed contract with Mr. Hixon illegal. Neither the Ethics Act, 65 Pa.S.A. § 401, *et seq.,* nor the Governor's Code of Conduct, Executive Order No. 1980–18, contains any prohibition against the employment by the state or any public body of persons who have been convicted of crimes having nothing to do with state employment in the remote past. Defendants have not pointed to any body of law from which it could be derived that Pennsylvania has a public policy of stigmatizing persons on the basis of remote criminal convictions. Nor have defendants identified any body of law from which it is demonstrable that Pennsylvania deems persons who have once given a false statement on a state employment application unfit for any subsequent employment with the Commonwealth or one of its agencies.

Subsection (3) of the regulation provides that the Attorney General's review should determine whether the contract provides for the adequate protection of all appropriate rights and remedies of the Commonwealth. Defendant Bartle argues that his refusal to approve the contract was authorized by this subsection because, had the contract been approved, Mr. Hixon would have had great opportunities for misuse of public funds. Implicit in this argument is the assumption that Mr. Hixon, because of his criminal conviction 18 years earlier, may be presumed to be the sort of person who would misuse public funds. Once again, Mr. Bartle can point to no authority for the

proposition that Pennsylvania law or public policy stigmatizes persons on the basis of remote criminal convictions.

It can be said that reasonable people could, and have, disagreed over the significance of the negative facts on Mr. Hixon's record—his conviction of a criminal offense at the age of 21, and his failure to disclose his conviction on a previous state job application—when weighed against those positive facts—including plaintiff's actual performance as a consultant to the Board under his 1978–80 contract—which led a majority of the Board to have confidence in his ability and integrity. It is not appropriately my role to cast a vote in this controversy one way or the other. I may only construe the statutory/regulatory scheme in order to determine whether the authority to resolve such a debatable issue was delegated to defendant Bartle or to the Board.

Defendant Bartle would have me read subsection (3), as well as subsection (2), as authorizing him to refuse his approval whenever he disagrees with the Board about the competence or integrity of the person with whom the Board has chosen to contract. If the regulation in question were indeed intended to grant the Attorney General such absolute discretion to overrule an agency's assessment of the qualifications and character of a potential contractor, the regulation would presumably have said so. Instead, the regulation limits the scope of the Attorney General's review to the making of five reasonably specific determinations. Giving subsection (3) its natural reading, it merely authorizes the Attorney General to determine, on the basis of his legal expertise, whether the proposed contract is drafted in such a way that the Commonwealth can be adequately protected in the event of a breach; it does not authorize him to invent and apply a presumption that a given individual, because of events in his past, will commit a breach.

Defendant Waldman's authority to review Mr. Hixon's second proposed contract is derived from the Commonwealth Attor-

neys Act, which gives the General Counsel authority to review contracts for "form and legality." 71 Pa.S.A. § 732–301(11). There is no other statutory provision defining the term "form and legality" with specific reference to § 732–301(11), nor are there any implementing regulations or legislative history to help in construing the term. However, in another section of the Commonwealth Attorneys Act, the General Assembly used identical language in authorizing the Attorney General to review contracts for "form and legality." 71 Pa.S.A. § 732–204(f). That section proceeds to limit the scope of the Attorney General's review to determining whether the "contract is in improper form, not statutorily authorized or unconstitutional." As there is nothing to indicate that the General Assembly intended the term "review for form and legality" to mean something different in § 732–301(11) of the Act, referring to the General Counsel's authority, than it is defined to mean in § 732–204(f) of the Act, referring to the Attorney General's authority, it is reasonable to assume that the General Counsel's scope of review is also limited to determining whether a proposed contract is in improper form, not statutorily authorized, or unconstitutional.

The letter in which defendant Waldman stated his reasons for refusing to approve the proposed contract reveals that his own conception of the scope of his authorized review goes considerably beyond any reasonable interpretation of the term "form and legality." The reasons he states for disapproving the contract may be summarized as follows: the compensation to be paid Mr. Hixon under the contract was excessive; Mr. Hixon was not competent; and, because of adverse publicity surrounding the disapproval by defendant Bartle of the first proposed contract, public confidence in government would be undermined were the contract to be entered into. Any of these reasons, if true, would be good reasons why the Board might have chosen not to enter into the proposed contract.[4]

---

4. I must note, however, that the Third Circuit in *Winsett, supra,* specifically rejected the argument that a public official might base a decision on fear of adverse publicity and reaction to

Defendant Waldman, it may be assumed, sincerely believed his allegations to be true. The Board, on the other hand, obviously believed otherwise. The question presented is not whether defendant or the Board held the correct opinion, but to which of them the General Assembly has delegated the authority to make the discretionary judgments involved. Clearly, that authority belongs to the body authorized by law to contract for the services of a financial consultant "as it deems advisable," not to the individual authorized merely to review the proposed contract for "form and legality." To hold, as defendant Waldman would have me hold, that he possessed broad power to substitute his judgment as to the competence and character of the proposed contractor for that of the Board would be to stretch the legislative language to the point of meaninglessness.

As the above discussion demonstrates, both defendant Bartle and defendant Waldman exceeded the scope of their legal authority in refusing to approve plaintiff's proposed contracts with the Board.

It should be clearly understood that this opinion does not express a judgment that the plaintiff should or should not have obtained the contracts he sought, or whether the Board acted prudently or irresponsibly. It is simply an application of the law to the review procedure and a recognition that the legislature has not vested an unlimited scope of review in the Attorney General or the General Counsel. If the legislature deems the existing scope of review inadequate to prevent a situation in which the fox might be placed in charge of the hen house, it is up to the legislature to change the law accordingly.

### 3. *The Statute of Limitations.*

Defendants Bartle and Waldman argued in their memoranda of law and at oral argument that plaintiff's claim is barred as untimely because the applicable statute of limitations is the six-month residuary stat-

ute for actions against government officials when no other statute applies, 42 Pa.C.S. 5522(b)(1). Defendant's argument has since been foreclosed by the opinion of the Court of Appeals in *Knoll v. Springfield Township School District,* 699 F.2d 137 (3rd Cir.1983), *rehearing den.* (Feb. 23, 1983). Under *Knoll,* plaintiff's § 1983 claim against defendants Bartle and Waldman is governed by Pennsylvania's six-year residuary limitations statute, 42 Pa.C.S. § 5527(6), and is therefore clearly timely.

### 4. *Qualified Immunity.*

Defendants Bartle and Waldman, as executive officials of state government performing discretionary functions, are entitled to invoke the qualified immunity defense. As most recently defined by the Supreme Court in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the qualified immunity defense is an objective test. The relevant inquiry is whether the law defendants violated was clearly established at the time they acted so that they reasonably should have known that the actions they took within the sphere of their official responsibility would violate the plaintiff's constitutional rights. *Id.* —— U.S. at ——, 102 S.Ct. at 2738, 73 L.Ed.2d at 409–11. Because the test focuses on whether the law a defendant violated was clearly established at the time he acted, whether defendants are entitled to prevail on the qualified immunity defense is an issue which may appropriately be resolved on summary judgment.

Unfortunately, in announcing the new test for qualified immunity in *Harlow,* the Supreme Court expressly declined to define what criteria a rule of law would have to meet in order to be deemed "clearly established." —— U.S. at —— – —— n. 32, 102 S.Ct. at 2739 n. 32, 73 L.Ed.2d at 410–11 n. 32. In many cases, the conclusion that a defendant violated a plaintiff's constitutional rights may depend not only on the application of principles of constitutional

public criticism when this consideration was not one of those listed in the governing regula-

tion, 617 F.2d at 1007–08.

law but on construction of state law as well. Presumably, every principle of law which is essential to the conclusion that the defendant violated plaintiff's rights must be "clearly established" for the qualified immunity defense to fail. Is the defense intended to establish a "one bite" rule for government officials, so that they will be protected from liability for damages until another official has been held to have violated the constitution in a case involving identical factual circumstances? Must every conceivable affirmative defense the official might raise in his own behalf have been explicitly rejected by an appellate court within the applicable jurisdiction? Or, at the other extreme, must the defense always fail unless the conclusion that the defendant violated the law depends on application of a rule of law announced for the first time by an appellate court at some point after the defendant acted? What weight should be accorded trial court decisions in determining whether the law is "clearly established"? And, if it is necessary in the course of adjudication to apply a statute, must the statute have been previously construed by a court, or may the court deciding the immunity question rely on its own view of what a "reasonable" reading of the statute would be?

■ In this case, plaintiff points out that the Third Circuit's en banc opinion in *Winsett v. McGinnis, supra*, was handed down three months before defendant Bartle refused to approve the first of the disputed contracts. Plaintiff also points out that both of the defendants are lawyers who supervise large legal staffs (although this is of doubtful relevance, as any "reasonably competent public official should know the law governing his conduct," *Harlow, supra*, —— U.S. at ——, 102 S.Ct. at 2739, 73 L.Ed.2d at 411).

Plaintiff's cause of action is firmly grounded on the holding of *Winsett*. Although *Winsett* involved a liberty interest rather than a property interest, and although the case of *Three Rivers Cable Vision, Inc. v. City of Pittsburgh, supra*, applying the rule in *Winsett* to a fact situation more closely analogous to Mr. Hixon's, was not handed down till November 12, 1980, after Mr. Bartle acted, the holding of *Three Rivers* can hardly be characterized as an unexpected extension of the rule announced in *Winsett*. When a rule of law is announced by a Court of Appeals sitting en banc, it would be unusual for the district courts within that Circuit to confine the holding of the appellate case strictly to its facts, in the absence of any reason inherent in the language or logic of the opinion why it should be so limited. Moreover, although defendants have repeatedly asserted that *Winsett* should be distinguished as a liberty interest case, they have suggested no rationale for distinguishing liberty and property interests for the purpose of this sort of due process analysis, nor do I know of any.

However, my conclusion that defendants violated plaintiff's constitutional rights rests not on the holding of *Winsett*, but also on my construction of the Pennsylvania statutory and regulatory provisions defining the scope of defendants' authority in reviewing contracts. As I have set forth earlier in this memorandum, I find defendants' construction of the scope of their authority to have been erroneous. Nevertheless, as far as either counsel or I have been able to discover, this Court is the first to have construed the scope of defendants' authority under these provisions. Moreover, as these provisions are enactments of Pennsylvania law, it is primarily the responsibility of the Pennsylvania courts to construe them. Although it has been necessary for me to construe these provisions in the course of adjudicating this federal-question case, my construction is not binding on the Pennsylvania courts.

Under the circumstances presented, I am unable to conclude that the defendants violated "clearly established" law. While I am convinced that defendants' interpretation of the scope of their authority in reviewing contracts was untenable and involved the arrogation to themselves of greater power to substitute their discretion for that of the Board than the statutory/regulatory scheme can fairly be said to have contem-

plated, yet defendants' interpretation of the scope of their authority was not so patently frivolous that they could not reasonably have hoped to persuade a court to their point of view. The qualified immunity defense should be applied so as to protect an official's freedom to exercise his independent judgment on a question of this sort unless and until his views are rejected by a court.

C. *Conclusions.*

It follows from the preceding discussion that defendants Bartle and Waldman's motion for summary judgment must be granted on the grounds that defendants are entitled to qualified immunity, and that plaintiff's motion for partial summary judgment must be denied.

## II. DEFENDANT HEDDINGER'S MOTION FOR SUMMARY JUDGMENT.

Plaintiff's case against defendant Fred Heddinger is based not on the constitution but purely on state law. As noted earlier, only two of plaintiff's original claims against defendant Heddinger are still extant: Count VI of the complaint, charging tortious interference with a prospective contractual relationship, and Count VIII of the complaint, charging defamation.

Plaintiff's claims against defendant Heddinger arise out of his course of conduct as a minority member of the Board who opposed the two proposed contracts at issue in this case. Mr. Heddinger does not assert that plaintiff has failed to state causes of action for tortious interference with prospective contractual relations or defamation. Rather, defendant Heddinger asserts his entitlement to summary judgment in his favor on both counts on the basis of absolute official immunity under Pennsylvania law. In addition, Mr. Heddinger argues that the tortious interference claim is barred by the statute of limitations.

■ Disputes over material facts preclude the entry of summary judgment in favor of defendant Heddinger on the defamation count. While I agree that Mr. Heddinger is entitled to invoke the absolute official immunity defense under Pennsylvania law,[5] this defense shields only conduct undertaken in the course of one's official duties. Plaintiff has demonstrated the existence of a genuine issue of fact as to whether several of Mr. Heddinger's allegedly defamatory statements were made within the course of his official duties as a member of the Board. For instance, defendant Heddinger published his allegedly defamatory statements in several letters written on Pennsylvania School Boards Association letterhead, an organization of which he was Executive Secretary. The School Boards Association is not alleged to be a governmental entity. In addition, these letters appear to have been written and sent after the Board had concluded its deliberations on one or both of the proposed contracts with Mr. Hixon. This lends further support to the inference that defendant Heddinger published the statements in his capacity as Executive Secretary of the School Boards Association, not in the course of his official duties as a member of the Board.[6] On the basis of this and other evidence of record, a jury could reasonably find that defendant Heddinger was not acting in the course of his official duties as a member of the Board in making the statements alleged to be defamatory. Mr. Heddinger would still, of course, be entitled to invoke constitutional doctrines designed to protect the freedom of public debate on issues of public concern. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The absolute immunity from liability accorded defendant Heddinger under Pennsylvania law, however, extends only so far as the scope of

---

5. *See Dubree v. Commonwealth,* 481 Pa. 540, 393 A.2d 293 (1978); *Zdaniewicz v. Sands,* 288 Pa.Super. 420, 432 A.2d 231 (1981); *Picariello v. Commonwealth,* 54 Pa.Cmwlth.Ct. 252, 421 A.2d 477 (1980).

6. Plaintiff appears to concede, and I would certainly agree, that the immunity defense shields defendant Heddinger from liability for statements contained in his February 20, 1981, letter to the Board's Chairperson and for remarks made at the Board's February 25, 1981, meeting.

his official duties as a member of the Board.

 The same factual dispute over whether Mr. Heddinger committed the acts upon which the claim of liability is based in his official capacity as a member of the Board precludes the entry of summary judgment in his favor on the tortious interference count of the complaint. If it were undisputed that defendant Heddinger acted in his official capacity throughout the events giving rise to this lawsuit, he would be entitled to summary judgment in his favor not only on the basis of official immunity, but also on the basis of the statute of limitations. *Knoll v. Springfield Township School District,* 699 F.2d 137 (3rd Cir.1983). Judge Aldersert, writing for the panel in *Knoll,* held that: (1) none of Pennsylvania's specific statutes of limitations apply to actions based on tortious interference with contract rights; (2) Pennsylvania courts would therefore apply the six-month residuary statute of limitations to such an action if it were brought against a state official under state law; and (3) because the six-month statute of limitations is inconsistent with federal policies underlying 42 U.S.C. § 1983, Pennsylvania's six-year residuary statute of limitations must be applied to such actions when brought against state officials under § 1983. As noted earlier in this Memorandum, *Knoll*'s holding defeats defendants Bartle and Waldman's claim that plaintiff's action against them under § 1983 is time barred. However, *Knoll* dictates the opposite result in the case of plaintiff's tortious-interference-with-contract claim against defendant Heddinger under state law, if defendant Heddinger is properly characterized as a public official for the purposes of this lawsuit. Resolution of the statute of limitations issue, then, like resolution of the immunity issue, must await trial of the disputed factual issue of Mr. Heddinger's status.

### ORDER

AND NOW, this 31st day of March, 1983, it is hereby ORDERED that:

1. Defendants Bartle and Waldman's motion for summary judgment is GRANTED.

2. Plaintiff's motion for partial summary judgment on the issue of liability as against defendants Bartle and Waldman only is DENIED.

3. Defendants Bartle and Waldman's motion for reconsideration of my refusal to dismiss Count I of the complaint is DISMISSED as moot.

4. Defendant Heddinger's motion for summary judgment is DENIED.

AND IT IS SO ORDERED.