**CURTIS AMBULANCE OF FLORIDA, INC., Plaintiff-Appellant,**

v.

**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF SHAWNEE, KANSAS, and Medevac Midamerica, Inc., Defendants-Appellees.**

No. 84–1892.

United States Court of Appeals, Tenth Circuit.

Feb. 18, 1987.

Michael R. Glover, Wentworth & Lundin, of Phoenix, Ariz. (Larry L. Luttjohann, Waggener, Arterburn and Luttjohann, of Topeka, Kan. with him, on the brief), for plaintiff-appellant.

Thomas L. Griswold (Mark V. Parkinson, with him on the brief), Payne & Jones, of Olathe, Kansas, for Board of County Com'rs of Shawnee County, Kan., defendant-appellee.

Robert E. Duncan, II, Davis & Bennett, of Topeka, Kansas (David A. Welte and Robert L. Wehrman, Polsinelli, White & Vardeman, of Kansas City, Mo., with him on the brief), for Medevac Midamerica, Inc., defendant-appellee.

Before MOORE and ANDERSON, Circuit Judges, and JOHNSON, District Judge.*

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff/appellant Curtis Ambulance of Florida, Inc. ("Curtis") was the low but unsuccessful bidder for a county contract to provide residents of Shawnee County, Kansas with ambulance services. When defendant/appellee Board of County Commissioners of Shawnee County ("Board") awarded the ambulance contract to a higher bidder, defendant/appellee Medevac Mi-

damerica, Inc. ("Medevac"), Curtis filed this action in federal district court in Kansas, claiming that the award of the contract to Medevac constituted a violation of its civil rights pursuant to 42 U.S.C. § 1983, a breach of contract, and a violation of the Kansas Open Meetings Law, Kan.Stat.Ann. §§ 75–4317 to –4320a (1984 & Supp. 1985). The district court dismissed the action upon motions filed by the Board and Medevac. Curtis appeals from that judgment of dismissal. We affirm.

## BACKGROUND

On July 1, 1983, the Board issued a "Request for Quotations" ("bid solicitation") from various ambulance companies to replace the outgoing ambulance service. The bid solicitation included a detailed set of bid specifications and set forth a closing date, a pre-bid meeting, and an invitation to contact certain county officials "prior to or subsequent to the pre-bid meeting" for additional information. R.Vol. II at 410.

The bid specifications were divided into four categories of service: combined emergency and non-emergency service; emergency service only; pre-scheduled transfer and non-emergency service only; and an alternate combined emergency and non-emergency service program, in which the bidder prescribed the model of service to be provided. In addition, the specifications contained maximum rates, bidder qualifications and requirements, and provided a tax subsidy of $455,000.00 for the successful bidder. No language in the specifications required the Board to award the contract to the lowest bidder. In fact, the only language concerning the Board's evaluation of bids stated:

13. *Rejection of Bids*
The county reserves the right to reject any and all bids and to waive any informalities in bidding.

R.Vol. II at 428.

Four companies, including Curtis and Medevac, submitted bids on the ambulance

* Hon. Alan B. Johnson, District Judge of the United States District Court for Wyoming, sitting by designation.

contract. Curtis submitted its bid on the first option, combined emergency and non-emergency service. Medevac submitted its bid on option four, the alternate combined service. The submitted bids were opened at a public meeting held at 2:00 p.m., July 28, 1983, at the Shawnee County Courthouse.

After the bids were opened, a bid review committee appointed by the Board to review the bids determined that Medevac was the "best" bid. The Board received the written recommendation of the bid review committee at a Board meeting on August 1, 1983. The committee's recommendation made no findings but merely stated that the Medevac bid was the "best" bid and should be accepted. R.Vol. I at 24.

At the August 1 meeting, a member of the Board made a motion to accept Medevac's bid. Before voting on the motion, the Board allowed Medevac representatives to appear before the Board to clarify and explain their company's bid. No representatives of Curtis or the other bidders were invited to attend the meeting. After Medevac representatives appeared, the Board, by a two to one vote, awarded the contract to Medevac.

On August 25, 1983, the Board and Medevac executed a contract for the provision by Medevac of ambulance services to Shawnee County. The contract provided, among other things, that the Board would (1) hold Medevac harmless from certain losses of revenue, (2) hold Medevac harmless from costs of litigation from third party challenges to Medevac's right to execute the contract, (3) allow Medevac to substitute a letter of credit for surety, (4) allow for options to extend the contract, and (5) "entertain an application by Medevac for the issuance of Industrial Revenue Bonds . . . for the purchase of equipment or other lawful purposes. . . ." R.Vol. I at 41.

Upon receiving the contract, Medevac applied for the issuance of industrial revenue bonds to finance the purchase of equipment. Medevac, the Board, and other public officials initiated appropriate procedures, conducted hearings, and drafted res-

olutions. Ultimately, bond counsel deemed the issuance of bonds clouded as a result of threatened litigation by Curtis. Consequently, Medevac abandoned its pursuit of that financing alternative and sought instead the issuance of "no-fund" warrants. The Board filed an appropriate application with the State Board of Tax Appeals and passed Resolution No. 83–149 authorizing $444,739 to be obtained from no-fund warrants for the purchase of ambulance equipment. At the time Resolution 83–149 was passed, the Board appointed Medevac's legal counsel as the Board's representative to the Civic Center Board.

Curtis was notified by letter of Medevac's selection. Following notification of the contract award to Medevac, Curtis commenced this action. The district court granted the defendants' motion to dismiss for failure to state a claim upon which relief could be granted. *Curtis Ambulance of Florida, Inc. v. Board of County Comm'rs*, Civ. No. 83–4366 (D.Kan. March 9, 1984). This appeal followed.

Curtis contends that the bidding and contracting procedure employed by the Board "turned into an unmitigated sham," R.Vol. I at 3, and that the Board's awarding the contract to Medevac amounted to a "sweetheart contract," R.Vol. I at 18. It claims that the Board "predetermine[d]" the award of the contract as evidenced by the Board's "waiving" and "changing" of bid specifications and agreeing to "improperly equip and subsidize [Medevac's] entire operation from the ground up." R.Vol. I at 3–4. Based on these and similar allegations, Curtis asks us to find the Board's conduct "arbitrary, capricious, and fraudulent," Brief of Appellant at 22, in breach of Curtis' constitutional and contractual rights, and in violation of the Kansas Open Meetings Laws.

In reviewing the grant of a motion to dismiss, we must take as true all well-pleaded allegations in the plaintiff's complaint and we must indulge all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974);

*Mitchell v. King,* 537 F.2d 385 (10th Cir. 1976); *Dewell v. Lawson,* 489 F.2d 877 (10th Cir.1974). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *Kennedy v. Meacham,* 540 F.2d 1057 (10th Cir.1976). With this standard in mind, we examine the propriety of the district court's dismissal of Curtis' complaint.

## I.

### DUE PROCESS

Curtis contends that as the "lowest responsible bidder" it had a constitutionally protected property interest in being awarded the contract. Reply Brief of Appellant at 4. It further contends that it was deprived of that property interest without due process when the Board awarded the contract to a higher bidder, Medevac. Curtis argues that the process due in this case was the non-arbitrary exercise of discretion by the Board in awarding the contract.

Our analysis of Curtis' due process claim requires us to examine the following issues: (1) the general legal standards applicable to a due process claim; (2) the extent to which courts have been willing to recognize the existence of a constitutionally protected property interest in the context of bidding for governmental contracts; (3) whether Curtis can claim any such property interest by virtue of any state or local laws, rules, resolutions, or regulations applicable to the bidding process in this case, including any "mutually explicit understandings" between Curtis and the Board; and (4) having concluded that the Board's Home Rule Resolution 80–139 is the most relevant local rule which might provide Curtis with the property interest it seeks, whether the bidding procedure here was subject to that Resolution or whether, because the provision of ambulance services involves the provision of professional services, the award of the contract here is exempt from the application of that Resolution. For the reasons set forth in this opinion, we conclude that ambulance services are professional services and therefore exempt from the bidding procedures of Resolution 80–139. Because we further find that no other local or state rule, regulation, law, or case authority mandates that the ambulance contract at issue here be awarded to the lowest responsible bidder, we hold that Curtis had no constitutionally protected property interest in the award of the contract.

### A. *Legal Standards Applicable to Due Process Claims.*

To prevail on its due process claim Curtis must prove that it had a definite liberty or property interest and that such interest was, under color of state law, abridged without appropriate process. *See Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Casias v. City of Raton,* 738 F.2d 392, 394 (10th Cir.1984); *Vinyard v. King,* 728 F.2d 428, 430 (10th Cir.1984). The process requirement necessary to satisfy fourteenth amendment procedural due process comes into play only after plaintiff has shown that it has a property or liberty interest. *Vinyard,* 728 F.2d at 430 n. 5 (citing *Roth,* 408 U.S. at 569–70, 92 S.Ct. at 2705). To establish a property interest in a particular benefit, one must have a "legitimate claim of entitlement" to it. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. "[A]n abstract need or desire for it" or a "unilateral expectation" is insufficient. *Id.; see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Whether such claim of entitlement exists, and the sufficiency thereof, is determined "by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). However, while the typical claim of entitlement is based upon "specific statutory or contractual provisions," it need not be. *Casias,* 738 F.2d at 394. Rather, "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are ...

rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

**B.** *Judicial Recognition of Constitutionally Protected Property Interest in Bidders.*

■ At the outset, we note that there is disagreement among the federal courts as to the existence of a constitutionally protected property interest by a bidder for a governmental contract or other benefit. *Compare L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517 (8th Cir.1985); *Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6 (W.D.Pa.1981); *Kendrick v. City Council*, 516 F.Supp. 1134 (S.D.Ga.1981) and *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980) (all recognizing the possibility that such a property interest can exist) *with Coyne-Delaney Co. v Capital Dev. Bd.*, 616 F.2d 341 (7th Cir.1980); *Sowell's Meats & Servs., Inc. v. McSwain*, 618 F.Supp. 140 (D.S.C.1985), *aff'd*, 788 F.2d 226 (4th Cir.1986) (per curiam) and *ARA Servs., Inc. v. School Dist.*, 590 F.Supp. 622 (E.D.Pa.1984); *City of Atlanta v. Ashland-Warner, Inc.*, No. C81–106A (N.D.Ga. Aug. 20, 1981) [Available on WESTLAW, DCTU database] (LEXIS, Genfed Library, Dist file); *J.P. Mascaro & Sons, Inc. v. Township of Bristol*, 497 F.Supp. 625 (E.D.Pa.1980) and *Estey Corp. v. Matzke*, 431 F.Supp. 468 (N.D.Ill.1976) (all doubting the existence of such a property interest). A number of courts have held, either explicitly or implicitly, that a disappointed bidder has no constitutionally protected property interest "until such time as the contract is actually awarded to him." *Estey*, 431 F.Supp. at 470;[1] *see also So-*

*well's Meats*, 788 F.2d at 228; *ARA Services*, 590 F.Supp. at 627–29; *Ashland-Warner.*

Other courts, including the district court in *Three Rivers*, the case on which Curtis heavily relies, have relatively recently recognized the existence of a "narrow" property interest in a disappointed bidder seeking a governmental contract. *See, e.g., L & H Sanitation*, 769 F.2d at 524; *Gold Cross Ambulance v. City of Kansas City*, 705 F.2d 1005, 1016–17 & n. 18 (8th Cir. 1983), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *Douglas N. Higgins, Inc. v. Florida Keys*, 565 F.Supp. 126 (S.D.Fla.1983); *Hixon v. Durbin*, 560 F.Supp. 654, 659–61 (E.D.Pa.1983); *Teleprompter of Erie*, 537 F.Supp. at 11; *Kendrick*, 516 F.Supp. at 1137–39.

In *Three Rivers* the plaintiff Three Rivers submitted a bid, pursuant to a Request for Proposals, for a cable television franchise for the city of Pittsburgh. A Cable Communications Ordinance adopted by the city council specified "the basic contract terms and specifications to be met by prospective bidders." 502 F.Supp. at 1120. The Ordinance and the Request specified that any bid failing to comply with the requirements stated therein would be summarily rejected. At several meetings, prospective bidders were told that no amendments to bids would be permitted. The specifications themselves gave the city the right to reject all bids. Certain provisions of the city's Home Rule Charter and the City Code required that contracts of the type involved be awarded to the "lowest responsible bidder." *Id.* at 1130.

After initially rejecting all four bids submitted for failing to comply with the Ordinance, the city council accepted new bids and ultimately awarded the contract to a Three Rivers' competitor. Three Rivers

---

**1.** In so holding, the *Estey* court stated:

In *Perkins v. Lukens Steel*, 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108], ... (1940) the Supreme Court recognized that although government contract bidding procedures may benefit the public generally, those procedures do not create enforceable rights in bidders....

The rationale of the *Perkins* case is still viable today and operates to preclude judicial challenges by unsuccesful bidders except when specific legislation allows it.
431 F.Supp. at 469 (the court noted, however, that the passage of 5 U.S.C. § 702 allows bidders on federal contracts to challenge contract awards by federal agencies, *id.* at 470).

then filed suit, alleging that while it had complied with the applicable specifications and requirements, the successful bidder had not so complied and had been permitted the opportunity to amend its bid deficiencies. After reviewing the Request, the Ordinance, and the relevant rules and regulations constituting the "existing rules and understandings," the district court concluded that "in the circumstances of this case a property interest of relatively narrow dimension exists." *Id.* at 1131. Recognizing that mere failure to follow applicable rules or procedures does not, without more, amount to a due process violation as "there can be no property interest in a procedure itself," the court found that the protected interest was "in the *benefit* whose enjoyment is sought to be regulated by the procedure; namely the award of the contract." *Id.* at 1128–29 (emphasis original). "[T]hat interest was the right of the lowest responsible bidder in full compliance with the specifications to be awarded the contract once the city in fact decided to make an award." *Id.* at 1131.

As the district court succinctly stated in *Hixon v. Durbin,* 560 F.Supp. 654 (E.D.Pa. 1983), the principle which has emerged from the *Three Rivers* line of cases is that:

> [w]hen state law provides that a given benefit which constitutes "property" or "liberty" ... shall be conferred upon those who take the requisite procedural steps and meet the requisite substantive standards, the right of an individual who has taken the requisite procedural steps to have his claim of entitlement to the benefit decided, not arbitrarily, but in accordance with state law, itself consti-

tutes an interest protected by the due process clause.

*Id.* at 661.

The *Three Rivers* rationale has not met with uniform acceptance. Courts generally agree that no property interest exists in a procedure itself, without more.[2] This is so because the process due and the constitutionally protected property interest are separate and distinct elements. *Three Rivers,* 502 F.Supp. at 1128–29. However, the line of cases in accord with *Three Rivers* has been characterized as a departure "from the longstanding refusal of the federal courts to recognize a due process property interest of a disappointed bidder on a state contract and represent[s] a minority viewpoint." *Sowell's Meats,* 618 F.Supp. at 146; *see also Sowell's Meats,* 788 F.2d at 228 (affirming the district court's decision, the Fourth Circuit stated: "[the district court's] decision is consistent with the majority rule barring an unsuccessful bidder from bringing an action against the contracting officials"). A number of courts have been careful to distinguish *Three Rivers* and confine it to its "unique factual allegations." *Douglas N. Higgins, Inc.,* 565 F.Supp. at 129; *Kendrick,* 516 F.Supp. at 1139; *see also Sowell's Meats,* 618 F.Supp. at 145; *Kasom,* 600 F.Supp. at 1559.

We find that, even were we to embrace the rationale of *Three Rivers* and similar cases and acknowledge the possibility that, in certain circumstances, a disappointed bidder for a government contract can have a constitutionally protected, albeit narrow, property interest, Curtis has failed to demonstrate that any provisions of state law or any "mutually explicit understandings" gave rise to such a property interest in this case.[3]

---

2. *Kasom v. City of Sterling Heights,* 600 F.Supp. 1555, 1558 (E.D.Mich.1985), *aff'd mem.* 785 F.2d 308 (6th Cir.1986); *ARA Services,* 590 F.Supp. at 627; *Beacon Syracuse Assocs. v. City of Syracuse,* 560 F.Supp. 188 (N.D.N.Y.1983); *Kendrick,* 516 F.Supp. at 1138–39; *but see Gold Cross Ambulance,* 705 F.2d at 1016 n. 18 (the court rejected the notion "that a legitimate claim of entitlement can never arise from the procedures established in the statutes or regulations adopted by a state or its subdivisions") (citing *Wilson v. Robinson,* 668 F.2d 380, 382–83 (8th Cir.1981)).

3. It is possible that, in certain cases, even in the absence of any law requiring that a government contract go to a particular qualifier (i.e., the lowest bidder), a constitutionally protected property interest can arise because of further action by the government. Such was the case in *Hixon,* where the court found that

> there was no law requiring the Board to offer a contract for financial advice to the lowest bidder, but there was a law authorizing the Board to contract for the services of a finan-

### C. Local or State Rules, Resolutions, and Regulations Governing Bidding.

■ As the district court stated, we "must examine the specifications, county regulations, resolutions and state statutes which regulated the award of the Shawnee County ambulance bidding procedure," slip op. at 10, as well as Kansas case law and any "mutually explicit understandings" to determine whether Curtis had any constitutionally protected property interest.

All parties agree that the most directly relevant local rule is Home Rule Resolution No. 80–139, adopted by the Board on October 28, 1980, which provides in pertinent part:

2. All contracts involving the expenditure of monies in excess of Ten Thousand Dollars ($10,000.00), and awarded pursuant to Chapter 86, Laws of 1980, shall be awarded on the basis of competitive bids to the lowest responsible bidder, taking into consideration conformity with the specifications, terms of delivery and other conditions imposed in the solicitation for bids.

. . . .

11. The Board of County Commissioners, after consultation with purchasing department, may provide for the purchase of professional services and for the purchase of contracts of insurance by competitive bids when it is deemed appropriate to do so.

R.Vol. I at 43, 45. Paragraph two only imposes upon the Board the obligation to award contracts to the lowest responsible bidder if the contract is awarded pursuant to Chapter 86, Laws of 1980. Chapter 86, Laws of 1980 which was codified at Kan. Stat.Ann. § 19–214 (1981), provides as follows:

(a) Except as provided in subsection (b), all contracts for the expenditure of county moneys in excess of ten thousand dollars ($10,000) shall be awarded on a public letting, to the lowest responsible bidder. . . .

(b) The provisions of subsection (a) shall not apply: (1) To the expenditure of county funds for professional services. . . .

Section 19–214 was amended in 1981 to provide as follows:

(a) Except as provided in subsection (b), all contracts for the expenditure of county moneys for the construction of any courthouse, jail or other county building, or the construction of any bridge in excess of $10,000, shall be awarded, on a public letting, to the lowest and best bid. . . .

(b) The provisions of subsection (a) shall not apply: (1) To the expenditure of county funds for professional services. . . .

Accordingly, Chapter 86, Laws of 1980 has been superseded by the current version of section 19–214. Resolution 80–139 was never amended to reflect that change. Nothing in the language of Resolution 80–139 indicates that the Board intended any amendments or revisions of Chapter 86, Laws of 1980 to be incorporated into the Resolution. The general rule is that:

[a] statute of specific reference incorporates the provisions referred to from the statute as of the time of adoption without subsequent amendments, unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments with the statute. In the absence of such intention subsequent amendments of the referred statute will have no effect on the reference statute. Similarly, repeal of the statute referred to will have no effect on the reference statute unless the reference statute is repealed by implication with the referred statute.

cial consultant as it deemed advisable. While Mr. Hixon had no protected property interests so long as he was merely seeking a contract with the Board, *a protected property interest arose after the Board formally voted, pursuant to its statutory authority, to enter into contracts with him.*

560 F.Supp. at 661 (emphasis added). In this case we do not find that Curtis has a constitutionally protected property right merely because the Board did in fact establish a competitive bidding procedure in which Curtis participated.

2A Sutherland, *Statutory Construction,* § 51.08 (1984); *see also EEOC v. Chrysler Corp.,* 546 F.Supp. 54 (E.D.Mich.1982); *Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co.,* 217 F.Supp. 210, 214 (S.D.N.Y.1963), *rev'd on other grounds,* 326 F.2d 841 (2nd Cir.1963), *cert. denied,* 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); *Board of County Comm'rs v. Teton County Youth Servs., Inc.,* 652 P.2d 400 (Wyo. 1982); *Ex Parte McMahan,* 94 Okla.Cr. 419, 237 P.2d 462 (1951). Curtis therefore correctly argues that the version of Kan. Stat.Ann. § 19–214 in effect at the time Resolution 80–139 was passed (Chapter 86, Laws of 1980) is the applicable statute for the purposes of paragraph two of Resolution 80–139.

That statute on its face appears to mandate that the contract for ambulance services at issue here go to the "lowest responsible bidder" unless such a contract is a contract for the provision of professional services and exempted from the application of Chapter 86, Laws of 1980 by subsection (b).[4] For the following reasons, we hold that such a contract is a contract for the provision of professional services and exempt from the coverage of Chapter 86, Laws of 1980, as incorporated in Resolution 80–139.[5]

D. *Ambulance Services as Professional Services.*

As the district court found, the bid specifications require the operator of the ambulance service awarded the contract to employ emergency personnel or "attendants" qualified as emergency medical technicians (EMTs) or mobile intensive care technicians (MICTs) to minister to the needs of persons requiring emergency medical services. These occupations require specialized medical training which the district court correctly concluded places them in the professional services category.

Neither state statute nor judicial decision in Kansas has addressed the precise question raised here. However, "[t]he definition of 'professional service' most commonly employed stems from *Marx v. Hartford Accident & Indem. Co.,* [183 Neb. 12, 157 N.W.2d 870 (1968) ]." *Bank of California v. Opie,* 663 F.2d 977, 981 (9th Cir.1981). In *Marx,* the case relied on by the district court, the Nebraska Supreme Court defined professional services as follows:

Something more than an action flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or man-

---

**4.** The district court apparently examined the application of Resolution 80–139 by considering the current version of Kan.Stat.Ann. § 19–214. It then concluded that § 19–214 did not cover ambulance service contracts because such contracts were for "professional services" within the meaning of subsection (b). As a result, Resolution 80–139 had no application to ambulance service contracts. We believe that subsection (a) of the current statute, as considered by the district court, clearly would not include contracts for ambulance services. We would not, therefore, even reach the question of subsection (b)'s professional services exemption if we were reviewing the current statute.

**5.** In interpreting the professional services exemption of subsection (b), Curtis argues that the district court failed to follow the rule of construction enunciated in several recent Kansas Supreme Court decisions to the effect that "when an act specifies a certain exemption to the general application of the statute, then the scope of the exemption is strictly construed and all other possible exemptions are excluded." Reply Brief of Appellant at 12. *See Director of Taxation v. Kansas Krude Oil Reclaiming Co.,* 236 Kan. 450, 691 P.2d 1303, 1309 (1984); *Jackson v. City of Kansas,* 235 Kan. 278, 680 P.2d 877, 886 (1984); *McGinnis v. Kansas City Power & Light Co.,* 231 Kan. 672, 647 P.2d 1313, 1319 (1982). We take due note of that maxim in reaching our conclusion in this case.

ual.... In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself. 157 N.W.2d at 871–72; *see also City of Omaha v. Hellmuth, Obata and Kassabaum, Inc.,* 767 F.2d 457, 459 (8th Cir.1985); *Horn v. Burns & Roe,* 536 F.2d 251, 255 (8th Cir.1976); *American Fellowship Mutual, Ins. Co. v. Insurance Co. of N. Am.,* 90 Mich.App. 633, 282 N.W.2d 425 (1979); *Multnomah County v. Oregon Auto. Ins. Co.,* 256 Or. 24, 470 P.2d 147 (1970). Thus, as the district court noted, the term "professional services" is "directed to the acts of those engaged in occupations applying specialized knowledge and intellectual skills to the performance of their duties." *Horn,* 536 F.2d at 255.

In addition, we agree with the New Jersey Supreme Court in *Autotote Ltd. v. New Jersey Sports & Exposition Auth.,* 85 N.J. 363, 427 A.2d 55 (1981), when it stated, "it is clear that the term 'professional services' is no longer limited to the traditional professions such as law and medicine.... If the law is to keep pace with scientific developments in business and commerce, it must adapt statutory provisions ... to the realities of the day." *Id.* 427 A.2d at 59 (citations omitted). The court in *Autotote* concluded that a contract for the installation and servicing of a "totalisator system," described by the court as involving "a complex computer network designed to tabulate and categorize the bets made on every horse in each race," involved the provision of "services of such a technical and scientific nature as to constitute 'professional services' within the statutory exception to the requirement of public bidding." *Id.,* 427 A.2d at 56 n. 1, 59; [6] *see also American Totalisator Co. v. Western Regional Off-Track Betting Corp.,* 44 A.D.2d 750, 396 N.Y.S.2d 301 (1974); *Waste Management, Inc. v. Wisconsin Solid Waste Recycling Auth.,* 84 Wis.2d 462, 267 N.W.2d 659 (1978). Similarly, the definition of "professional services" must keep pace with developments within the medical field.

With the general pronouncements of *Marx, Horn,* and *Autotote* in mind, we turn to a consideration of the statutes cited by Curtis as well as those regulating the qualifications of EMTs and MICTs to determine whether such occupations require sufficient "specialized knowledge and intellectual skills" or are of such a "technical nature" to be deemed "professional services" within the intent of section 19–214.

Curtis correctly argues that EMTs and MICTs are not among those occupations listed in the Kansas professional corporations statute, Kan.Stat.Ann. § 17–2707(b) (1981), which lists a number of professional services that may incorporate as professional corporations.[7] Even if the list in section 17–2707(b) were read as all inclusive, it applies only to incorporation and makes no reference to Kan.Stat.Ann. § 19–214.

As additional support for its argument that ambulance services are not professional services, Curtis cites Kan.Stat.Ann. §§ 19–261, 19–262, 65–2802, 65–2837, 65–

---

6. *Autotote* has been called "a leading case in the field." *General Eng'g Corp. v. Virgin Islands Water & Power Auth.,* 805 F.2d 88, 95 (3rd Cir.1986).

7. Section 17–2707(b) defines "professional services" as follows:

(b) "Professional service," the type of personal service rendered by a person duly licensed by this state as a member of any of the following professions, each paragraph constituting one type:

(1) A certified public accountant;
(2) An architect;
(3) An attorney-at-law;
(4) A chiropractor;
(5) A dentist;
(6) An engineer;
(7) An optometrist;
(8) An osteopathic physician or surgeon;
(9) A physician, surgeon or doctor of medicine;
(10) A veterinarian;
(11) A podiatrist;
(12) A pharmacist;
(13) A land surveyor;
(14) A certified psychologist;
(15) A specialist in clinical social work;
(16) A registered physical therapist;
(17) A landscape architect;
(18) A registered professional nurse.

4301, 65–4306, 65–4314, 40–3401 and 40–3402. None of these statutes directly address the question at issue, but Curtis argues they suggest that ambulance services are not professional services. We disagree.

Sections 65–2802 and 65–2837 are portions of the Kansas Healing Arts Act, Kan. Stat.Ann. 65–2801 to –2890 (1985), which regulates those engaged in the practice of the "healing arts," defined in section 65–2802 as including:

> any system, treatment, operation, diagnosis, prescription, or practice for the ascertainment, cure, relief, palliation, adjustment, or correction of any human disease, ailment, deformity, or injury, and includes specifically but not by way of limitation the practice of medicine and surgery; the practice of osteopathic medicine and surgery; and the practice of chiropractic.

Section 65–2837 discusses professional conduct, detailing "professional incompetency," "unprofessional conduct, and false advertising." EMTs and MICTs are not specifically included in the Healing Arts Act, nor are they specifically excluded by section 65–2872, which lists a number of professions deemed not to be engaged in the practice of the "healing arts." Among those listed in section 65–2872 are psychologists, dentists, optomotrists, nurses, podiatrists, and pharmacists. Each excluded profession obviously involves professional services and each is regulated under a separate article of Chapter 65. While EMTs and MICT's are not expressly excluded as a form of the healing arts by section 65–2872, they are impliedly removed from the purview of the Healing Arts Act by subsection (g) which refers to "[p]ersons whose *professional services* are performed under the supervision or by order of or referral from a practitioner who is licensed under

this act." (emphasis added). MICTs and EMTs are statutorily authorized to perform certain medical procedures only upon establishing "voice contact" with, and under the supervision of, a person licensed to practice medicine. *See* Kan.Stat.Ann. § 65–4306a (1985).[8] Thus, contrary to Curtis' argument, section 65–2872 suggests that emergency medical services performed by a MICT or EMT under the direction of a licensed physician may also be professional services.

In addition, "Emergency medical services" are accorded separate treatment in Chapter 65 as are the professions listed in section 65–2872. Article 43 is devoted solely to "Emergency medical services" and defines that term to include the following services:

> 65–4301. Definitions. As used in this act: (a) "Emergency medical service" means a service which provides for the effective and coordinated delivery of such emergency care as may be required by an emergency, including transportation of individuals by ground or air ambulances and the performance of authorized emergency care by a person licensed to practice medicine and surgery, a licensed professional nurse, a registered physician's assistant, a crash injury management technician, an *emergency medical technician,* emergency medical technician-intermediate or a *mobile intensive care technician.*

Kan.Stat.Ann. § 65–4301(a) (1985) (emphasis added). Curtis argues that "Article 43 does not refer to anyone less than a registered professional nurse (K.S.A. 65–4306) as a professional." Brief of Appellant at 10. We cannot conclude from that fact that those who perform emergency medical services cannot perform professional services within the meaning of the bidding statutes.[9]

---

8. MICTs can perform certain medical procedures during an emergency before contacting a person licensed to practice medicine "when specifically authorized to perform such activities by written protocols approved by the local component medical society." Kan.Stat.Ann. § 65–4306(e) (1985).

9. Section 65–4301(d) defines EMTs as "personnel who have been trained in preliminary emergency medical care in an 81–hour training program approved by the university of Kansas school of medicine." Section 65–4301(f) defines MITCs as "personnel who have been specifically trained in emergency cardiac and noncardiac

Curtis similarly cites Kan.Stat.Ann. 19–262, which specifies that "[n]o operator with which the board of county commissioners has a contract as provided in K.S.A. 19–261 ... shall use the operation of ambulances as advertising or promotion for any other business venture of the operator." Section 19–261 authorizes the county to enter into contracts for the provision of ambulance services. Curtis argues the "any other" language is "superfluous unless the ambulance operation is indeed a business venture." Brief of Appellant at 13. We think Curtis places too much reliance on that language and we doubt that "business venture" is necessarily inconsistent with the provision of professional services. We find section 19–262 does not clearly indicate that ambulance services are not professional services.

Curtis finally directs our attention to sections 40–3401 and 40–3402, which are portions of Article 34 concerning Health Care Provider Insurance. Curtis argues that since the definition of "health care provider" in section 40–3401(f) does not specifically include EMTs or MICTs, they are not required to maintain professional liability insurance pursuant to section 40–3402. As with Curtis' other statutory arguments, we do not find that the failure to explicitly require EMTs or MICTs to maintain professional liability insurance indicates that they do not perform professional services for the purpose of the bidding statutes.

In sum, we are not persuaded that the various statutory provisions cited by Curtis, alone or in combination, clearly indicate that EMTs and MICTs cannot be deemed to perform professional services for the purposes of subsection (b) of Chapter 86, Laws of 1980. By contrast, the general discussion of "professional service" found in *Horn, Marx, Autotote,* and other cases convinces us that ambulance services fall within that category. Certification to become an EMT or MICT requires neither an advanced degree nor the successful completion of a licensing exam. However, certification for an EMT requires 81 hours of training in advanced emergency care treatment and certification for an MICT requires 200 hours of training. The training must be approved by the University of Kansas Medical School. The services these occupations are required to perform combine the ability to make split-second decisions in life-threatening situations with the performance of precise lifesaving skills. The specialized training, knowledge, and skills required of EMTs and MICTs place them within the definition of professional services found in *Horn, Marx* and *Autotote.* In so holding, we note that at least one other court has reached a similar conclusion. *Amherst Columbia Ambulance Serv., Ltd. v. Gross,* 80 A.D.2d 719, 437 N.Y.S.2d 137 (1981) ("[T]he furnishing of ambulance services is one requiring special skill or training excepting it from the general competitive bidding requirement.")

Curtis' other arguments on the professional services issue do not persuade us to the contrary. It argues that the district court erred in making its decision without an evidentiary hearing on the nature of the services performed by EMTs and MICTs; that, as the contract between Medevac and the County permitted assignment of Mede-

---

care in a training program certified by the university of Kansas school of medicine." Sections 65–4306 and 65–4306a set forth the authorized activities of MICTs and EMTs; section 65–4308 establishes a minimum 200 hour training requirement for MICTs; and section 65–4321 regulates, in part, the certification of EMTs and MICTs.

Section 65–4314 contains certain definitions concerning the regulation of ambulance services, including the following definition of "ambulance service":

(d) "Ambulance Service" means any organization operated for the purpose of transporting

sick, injured, disabled or otherwise incapacitated persons to or from a place where medical care is furnished, whether or not such persons may be in need of emergency care in transit.

Curtis argues the district court "ignores the definition of 'ambulance service' in K.S.A. 65–4314(d)" although it does not explain how the district court "ignored" that definition. Brief of Appellant at 12. Our examination of the provisions of Article 43 does not convince us that Curtis' services could not be professional services.

vac's rights and duties under the contract with the County's prior approval, the contract could not have contemplated the provision of professional services; that the contract really amounted to the grant of a franchise, which cannot involve professional services; and that the contract at issue cannot have been for professional services as it was between the County and an ambulance service operator, not EMTs and MICTs. These arguments merit little consideration.

The district court had sufficient information before it concerning the nature of Curtis' business to determine whether an ambulance service performs professional services within the meaning of subsection (b) of Chapter 86, Laws of 1980.[10] Curtis' own cases cited in support of its assignment argument simply state the general rule "that rights arising out of contracts involving personal services, special confidence and the like *are not assignable by one party without the consent of the other party thereto.*" *Alldritt v. Kansas Centennial Global Exposition, Inc.,* 189 Kan. 649, 371 P.2d 181, 187 (1962) (emphasis added). Even assuming Medevac's services would fall within the category of "personal services" or "special confidence," the contract between Medevac and the County did nothing other than permit such assignment with the County's prior permission. Curtis offers no authority for its franchise argument and we reject it. Finally, Curtis' allegation that because the contract for the provision of ambulance services was be-

tween the County and an ambulance operator, not EMTs or MICTs, it cannot be a contract for professional services within the meaning of the subsection (b) exemption is easily dismissed. Clearly, the basic purpose of the contract for the provision of ambulance services was to obtain the services of the EMTs and MICTs. The legal form or the particular business arrangement by which such services are provided is of no import.

As an entity which provides professional services, Curtis is exempted from the application of Chapter 86, Laws of 1980 and, therefore, from the application of paragraph two of Resolution 80–139.[11] Paragraph eleven is of no greater assistance to Curtis. It simply provides that the County "may" enter into a contract for professional services by competitive bidding. It imposes no requirement that the contract go to the lowest responsible bidder. As we have already indicated, we are unwilling to find that Curtis acquired a property interest simply because the Board decided to award the contract pursuant to a competitive bidding procedure.[12] Neither paragraph two nor paragraph eleven of Resolution 80–139 mandates that the contract at issue here go to the lowest responsible bidder.

Curtis directs us to no other provision of Resolution 80–139 nor any other applicable Kansas resolution, rule, statute or judicial authority which imposes such an obligation.[13] Similarly, no "mutually explicit

---

10. Curtis attached numerous exhibits to its complaint, including a copy of the contract for the provision of ambulance services between Medevac and the County and the bid specifications. The district court could have determined the nature of Curtis' services from that information.

11. The Board makes the additional argument that even if paragraph two does apply to the ambulance contract at issue, it does not require the Board to award the contract solely on the basis of price. Rather, it permits the awarding authority also to "take into consideration conformity with the specifications, terms of delivery and other conditions imposed in the solicitation for bids." Brief of Appellees/Board at 12 (quoting Resolution No. 80–139, ¶ 2). Thus, the Board argues that paragraph two directs it to

consider nonprice factors as well as price. We need not address the impact this additional language in paragraph two might have, as we have found paragraph two is inapplicable to the ambulance contract at issue.

12. See *supra,* note 2.

13. Curtis points out that on August 9, 1983, the County passed Home Rule Resolution 83–11 which provided as follows:

THE Board of County Commissioners of Shawnee County, Kansas, sitting in regular session on this *9th* day of August, 1983, do hereby resolve that Home Rule Resolution No. HR–82–2 shall be amended as follows:

1. ARTICLE II. APPLICATION FOR CONTRACT. Paragraph 21 shall be amended to read as follows:

understandings" exist between the Board and Curtis which give rise to any property interest.[14] Curtis' argument that the contract at issue was in effect the award of a franchise, a recognized form of property, is similarly unavailing unless Curtis had a legitimate claim of entitlement to it. In short, Curtis, unlike the plaintiff in *Three Rivers* and other similar cases, is unable to demonstrate the existence of applicable local or state rules which sufficiently circumscribe the Board's authority to award the contract in dispute such that Curtis had anything other than a mere "unilateral expectation" of receiving the ambulance contract.

Consequently, we do not need to examine the question of Curtis' alleged conformity to the specifications, Medevac's alleged nonconformity, or the alleged arbitrariness of the Board in selecting Medevac. We are satisfied the district court correctly found that Curtis failed to state a claim for relief

> "21. *Application for Contract.* Application for a contract to operate an ambulance service shall be in accordance with the bid procedures set out in Resolution No. 80–139."
>
> 2. Paragraphs 22, 23, 24, 25 and 26 of ARTICLE II, APPLICATION FOR CONTRACT, shall be deleted.

Home Rule Resolution 82–2 was a detailed enabling act which authorized the County to contract for ambulance services and specified the procedure for doing so. We believe the passage of Resolution 83–11 supports our view that ambulance services are professional services and, therefore, but for Resolution 83–11, not covered by Resolution 80–139. The Board would have seen no need to pass Resolution 83–11 if 80–139 already applied to ambulance service contracts.

Curtis also directs our attention to paragraphs 5, 6 and 9 of Resolution 80–139, which impose the obligation to award contracts involving the expenditure of $10,000 or less to the lowest responsible bidder. Those paragraphs are clearly inapplicable to the ambulance contract here, as all parties agree that the contract here involved the expenditure of more than $10,000. We are not persuaded that the existence of the "lowest responsible bidder" requirement for the types of contracts listed in paragraphs 5, 6 and 9 imposes a similar requirement for other contracts listed in other paragraphs. The Board obviously knew how to include such a requirement when it so desired.

14. The bid specifications cannot be read as providing any assurance that the lowest responsible

for violation of due process under the facts alleged.

## II.

### EQUAL PROTECTION

We also affirm the district court's dismissal of Curtis' section 1983 claim based on equal protection. Curtis argues that the Board "violated its equal protection rights by unequally and arbitrarily applying Home Rule Resolutions 80–139, 82–2, and 83–11." Reply Brief of Appellant at 18. It is well settled that "a law fair on its face may be applied so arbitrarily and unfairly as to amount to a violation of constitutional rights." *Cook v. City of Price*, 566 F.2d 699, 701 (10th Cir.1977) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1887)). However, Curtis' equal protection claim fails for the simple reason that we have found that the applicable Resolutions on

bidder would receive the contract. The specifications required bidders to submit an array of information, of which cost was only one factor. Also, the specifications specifically provided that the Board could reject "any and all bids" and contained no limits on the right of the Board to exercise that option. Moreover, the Board was free "to waive any informalities in bidding." The specifications here do not state, as did the specifications in *Three Rivers*, that bids not in strict compliance with specifications would receive no consideration. Nor do the specifications here give any assurance that the lowest bidder in compliance with the specifications would receive the contract. Thus, the bid specifications do not create the necessary property interest.

Curtis also has alleged that "[i]t was the custom or long standing practice of the Board to award competitively bid contracts to the lowest responsible bidder." Brief of Appellant at 25. Curtis did not make that allegation in its complaint and the district court made no findings thereon. We accordingly have no basis to conclude that, even assuming the existence of such a practice, it amounts to the kind of "common law" regarding the award of contracts suggested by the Supreme Court in *Board of Regents v. Roth*, 408 U.S. at 578, 92 S.Ct. at 2709, as a possible source of a legitimate claim of entitlement. *See also, Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 512 n. 9, 88 L.Ed.2d 523 (1985) ("A property interest ... cannot be inferred from a consistent practice without some basis in state law.")

which Curtis relies gave to the Board broad discretion in awarding the contract and did not, as Curtis argues, impose upon the Board the requirement to award the ambulance contract to the lowest responsible bidder. We are aware of no authority "holding or suggesting that the exercise by a state of a consumer's choice between competing products denies the disappointed supplier equal protection of the laws." *Coyne-Delaney Co. v. Capital Dev. Bd.*, 616 F.2d 341, 343 (7th Cir.1980). We therefore cannot find that the Resolutions here were unequally applied in the award of the ambulance contract.

Curtis' reliance on *Three Rivers* and *Cook* is unavailing. As we noted previously, *Three Rivers* is inapplicable because of the specific requirements that the city of Pittsburgh imposed as part of its bidding procedures. In *Cook*, the plaintiff complained that zoning ordinances had been discriminatorily enforced because she was the only business person ticketed for the operation of a business in a residential area. Similarly, there was no question as to the prohibitions contained in the zoning ordinance at issue. That is not the case here. Viewing the facts in the light most favorable to Curtis, we find no support for its section 1983 claim for violation of equal protection.

## III.

### CONTRACT AND FRAUD

■ Curtis' implied contract and fraud claims merit little consideration. Curtis contends that putting up "for competitive bid the county ambulance services contract" "constituted an offer to all interested ambulance providers to submit their bids with the understanding, expressed in Home Rule Resolution 80–139 (and reinforced throughout the bid term), that the ambulance services contract would be awarded to the lowest responsible bidder." Reply Brief of Appellant at 22. Curtis then argues that it accepted that offer by "preparing the bid in conformance with the specifications," thereby giving rise to a contract which the Board allegedly breach-

ed "by considering the bids and awarding the contract in an unreasonable, arbitrary, capricious, discriminatory and illegal manner." *Id.* at 23. It finally argues that, if no express contract exists, then at least an implied contract exists between itself and the County. The existence or nonexistence of a contract is a question of fact, Curtis argues, thereby precluding dismissal here.

Curtis' contract claims, by its own admission, depend upon its argument that Resolution 80–139 required that the ambulance contract go to the lowest responsible bidder. Having found that the Resolution imposes no such requirement, we similarly reject Curtis' contract arguments.

■ In the district court, and only briefly on appeal, Curtis appears to make a third-party beneficiary argument, largely in reliance on *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir.1972), claiming that "the request for a bid ... and specifications, created a contractual obligation on the part of the defendant Board ... and plaintiff is in the protective realm of the obligation created by such resolution. The plaintiff as the lowest responsible bidder under the bid specifications and procedures is a proper third party beneficiary of the contractual obligations set forth under the bid specifications, requirements, and procedures ..." R.Vol. I at 17–18; Complaint, ¶ 28.

We reject Curtis' argument that it was the intended beneficiary of any contractual relationship between the County and Medevac. The contract itself contains nothing suggesting that Curtis is such a beneficiary. Furthermore, *Euresti* is inapposite to Curtis' argument that it is "within the protective realm of legislation or regulations in the public interest," 458 F.2d at 1118, so as to give rise to an implied right of action to enforce Resolution 80–139. In *Euresti*, indigent county residents brought a class action against hospital administrators, trustees, and county commissioners seeking a declaratory judgment to compel the hospital to provide free or below cost services to them. The action was based on the Hill-Burton Act, Title VI of the Public

Health Service Act, 42 U.S.C. § 291–291o–1., which requires that hospitals which receive federal funds provide free or below cost services to indigents. This court determined that, even in the absence of a contractual relationship between the hospital and the federal government, indigents, "those clearly within the protective realm" of the Hill-Burton Act, had an implied right of action to require the hospital to provide such services.

Curtis is not an intended beneficiary of Resolution 80–139. "The competitive bidding procedures are designed to protect taxpayers from the wasteful or fraudulent expenditure of public funds...." *ARA Services*, 590 F.Supp. at 628 (quoting *Regional Scaffolding & Hoisting Co. v. City of Philadelphia*, 593 F.Supp. 529 (E.D.Pa. 1984)). "Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good." *Autotote*, 427 A.2d at 58 (quoting *Terminal Constr. Corp. v. Atlantic City Sewerage Auth.*, 67 N.J. 403, 341 A.2d 327 (1975)). As we have already determined, Resolution 80–139 imposed no requirement that contracts of the type involved here go to the lowest responsible bidder. We do not believe that Resolution includes disappointed bidders within its protective realm.

 Curtis did not argue its fraud theory to the district court and will not be allowed to argue that theory on appeal. *Dothard v. Rawlinson*, 433 U.S. 321, 323 n. 1, 97 S.Ct. 2720, 2724 n. 1, 53 L.Ed.2d 786 (1977); *United States v. Immordino*, 534 F.2d 1378, 1381 (10th Cir.1976); *Harman v. Diversified Medical Invs. Corp.*, 524 F.2d 361, 365 (10th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976); *International Union of Operating Eng'rs, Local 953 v. Central Nat'l Life*

*Ins. Co.*, 501 F.2d 902, 907 (10th Cir.1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 397 (1975). In any event, we have reviewed the allegations of the complaint and find that they fail to meet the specificity requirements for allegations of fraud.[15]

## IV.

### PENDENT STATE CLAIM

 Curtis challenges the district court's decision to decline to exercise pendent jurisdiction over Curtis' state law claim for violation of the Kansas Open Meetings Law, Kan.Stat.Ann. § 75–4317 to –4320a (1984 & Supp.1985). As the district court correctly noted, its decision in that regard was discretionary; therefore, absent an abuse of discretion, this court will not overturn that decision on appeal. *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1155 (10th Cir.1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Among the factors to be considered in determining whether to exercise pendent jurisdiction are "whether the federal claims were dismissed before trial, whether the state claims predominate, whether the state claims are closely tied to questions of federal policy, and whether the jury is likely to be confused by the treatment of divergent legal theories of relief." *In Re Carter*, 618 F.2d 1093, 1104–05 (5th Cir.1980), *cert. denied*, 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981). While the Supreme Court has suggested that dismissal of all federal claims does not automatically require dismissal of pendent state claims, *see Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), we hold that, considering the factors enumerated above, the dis-

15. Curtis argues, for the first time in its Reply Brief, that the district court "prior to its dismissal of plaintiff's Complaint, should have afforded plaintiff the opportunity to amend its Complaint to supplement any factual allegations deemed insufficient by the Court." Reply Brief of Appellant at 25. This argument deserves little consideration. While we note that, gener-

ally speaking, leave to amend should be freely given and that, under Fed.R.Civ.P. 15(a) a party "may amend his pleading once as a matter of course at any time before a responsive pleading is served," Curtis never sought to amend its pleading in district court. Neither this court nor the district court is obligated to conduct Curtis' case for it.

trict court did not abuse its discretion in declining to exercise pendent jurisdiction.[16]

## CONCLUSION

For the foregoing reasons, the decision of the district court dismissing Curtis' complaint is AFFIRMED.

---

16. Curtis for the first time in its Reply Brief argues that its Kansas Open Meetings Law claim "implicat[es] due process considerations," and that defendants' alleged violation of the law "rises, in the opinion of plaintiff, to a federal concern as a matter of due process under 42 U.S.C. § 1983." Reply Brief of Appellant at 25. As with its fraud claim, Curtis failed to argue this below and cannot raise it for the first time on appeal.