MORITZ, Circuit Judge,
concurring in part and dissenting in part.
Throughout its opinion, the majority repeatedly and consistently states that Martin Marietta asserts a property interest in actually supplying aggregate from its quarries to KDOT projects. Yet Martin Marietta challenges only the dismissal of its claim that it has a property interest in inclusion or retention on the Approved List — not in actually supplying aggregate.
Applying a properly cabined due process analysis and considering only whether Martin Marietta has a property interest in inclusion or retention on the Approved List, I would hold that Martin Marietta has plausibly stated a legitimate claim to entitlement. Therefore, Martin Marietta’s removal from that list without notice or hearing violated its right to due process under the Fourteenth Amendment. Thus, I dissent from the majority’s decision affirming the district court’s dismissal of Martin Marietta’s procedural due process *1187 claim with respect to its asserted property interest.
However, because Martin Marietta hasn’t challenged on appeal the district court’s conclusion that it wasn’t defamed, I concur in the majority’s decision to affirm the dismissal of its liberty interest claim.
I. Martin Marietta asserts a legitimate claim of entitlement to inclusion and retention on the Approved List.
To possess a protected property interest, Martin Marietta must show that state statutes, established rules, or mutually explicit understandings give it a “legitimate claim of entitlement” to that interest. An “ ‘abstract need or desire for it’ or a ‘unilateral expectation’ is insufficient.” Curtis Ambulance of Fla., Inc. v. Bd. of Cty. Comm’rs, 811 F.2d 1371, 1375 (10th Cir.1987) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).
“A property interest exists if ... the procedures in question, ... if followed, require a particular outcome.” Crown Point I, LLC v. Intermountain Rural Elec. Ass’n, 319 F.3d 1211, 1217 (10th Cir.2003). State laws, rules, and regulations don’t create property interests if “the governing body retains discretion” to confer or deny a benefit. Id. In determining “whether a plaintiff presents a legitimate claim of entitlement,” the court “focus[es] on the degree of discretion given the deci-sionmaker and not on the probability of the decision’s favorable outcome,” Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1116 (10th Cir.1991), or on whether the laws, rules, regulations, and procedures in question can be changed, see Brown v. Eppler, 725 F.3d 1221, 1226-27 (10th Cir.2013).
The majority’s analysis goes awry early on when it misstates or miscomprehends the interest to. which Martin Marietta claims it has a “legitimate claim of entitlement.” Specifically, the majority consistently and repeatedly mischaracterizes Martin Marietta’s asserted property interest as an interest in actually supplying aggregate from its quarries to KDOT projects.[1]
Admittedly, Martin Marietta’s pleadings contain some conflicting language regarding the scope of the interest it asserts.[2] And the district court may have conflated those two possible interests in dismissing this case.[3] But on appeál, Martin Marietta clearly challenges only the district court’s *1188 conclusion that it had no property interest in remaining on the Approved List, and it concedes its property interest isn’t contingent on actually supplying material to KDOT projects. See Aplt. Reply Br. 25 (“Being on the Approved List is ... a right to sell,” which doesn’t “guarantee sales.” (emphasis added)); cf. Ripley v. Wyo. Med. Ctr., Inc., 559 F.3d 1119, 1124-25 (10th Cir.2009) (discussing alternative property interests — one in receiving hospital privileges and another in exercising those privileges).[4] Moreover, KDOT recognizes that Martin Marietta argues it has a property interest in having “aggregate from its quarries on KDOT’s Approved List for use in on-grade pavement.” Aplee. Br. 16-17.
Martin Marietta clearly asserts a property interest in its inclusion and retention on the Approved List, and I would consider only that asserted interest in determining whether Martin Marietta has plausibly alleged a violation of procedural due process.
II. KDOT lacks discretion to include or remove a qualified quarry from its Approved List if that quarry meets the Standard Specifications.
Having mischaracterized the nature of the asserted property interest, the majority compounds its error by applying the degree-of-discretion test to KDOT’s discretion to oversee the quality of the aggregate actually used by suppliers.[5] But again, Martin Marietta doesn’t claim an interest in ultimately supplying aggregate, or in contracting with any particular contractor. Nor does Martin Marietta contend that KDOT lacks discretion to oversee the quality of aggregate actually used by contractors. I would- restrict application of the degree-of-discretion test to the property interest alleged, and consider whether KDOT has discretion to include or remove suppliers from its Approved List.[6]
*1189 A. KDOT’s procedure for including a quarry on the Approved List
Kansas’ Secretary of Transportation has broad supervisory authority over the “construction and maintenance of all roads ... throughout the state,” with certain exceptions not relevant here. Kan. Stat. Ann. § 68-404(a). This includes authority “to make tests, do research, to inspect and test all materials, supplies, equipment, and machinery used for state highway purposes, and to develop methods and procedures for this purpose.” Id. § 68-404(h). The Secretary may exercise this authority by “adopting] rules and regulations,” id. § 68~404(k), and performing “such other acts and duties,” id. § 68-404Q), necessary to carry out the State’s transportation-related laws.
The Secretary has exercised this authority by adopting the Standard Specifications for State Road and Bridge Construction (2007), as amended by the Special Provisions to the Standard Specifications. Division 1100 of the Standard Specifications “covers the basis of approval, certification and acceptance of aggregates,” Std." Specs. § 1101.1, and incorporates the sampling and testing requirements contained in Part V of KDOT’s Construction Manual,[7] id. § 1101.2(b)(2). Part V, in turn, provides a specific procedure and substantive requirements for sources to prequalify. These procedures and requirements are significant because KDOT will reject any aggregates “produced from deposits, ledges, or beds that have not been previously approved for quality.” Id. § 1101.2(b)(4).
Inclusion on the Approved List, however, doesn’t guarantee a source will be used to supply a KDOT project because contractors choose which source or sources to use. See id. § 101, at 9 (defining “suppliers” as entities “from which the Contractor obtains commodities needed to fulfill the contract”).
Part V of KDOT’s Construction Manual provides the process for prequalifying to supply aggregate. In general,
[additional testing is performed on concrete produced with Class I and Class II Aggregates to determine if acceptable levels of concrete freeze/thaw resistance are provided. The freeze/thaw testing is intended to reduce the risk of the occurrence of premature “D-Cracking.” ... Prequalification to produce Class I and Class II Aggregate is granted to a quarry on a bed by bed basis for each distinct bed in the quarry face. “Official Quality” sampling and testing is also required. The acceptance of Class I and Class II Aggregate is contingent upon production being from approved beds and in compliance with “Official Quality” requirements.
Part V § 5.02(c)(1).
Specifically, for inclusion on the Approved List, a quarry operator contacts the District Materials Engineer (DME), who is responsible for initiating KDOT’s prequalification process. Id. § 5.02(c)(2)a. The Chief Geologist then arranges for a quarry inventory and sample collection. Id. § 5.02(c)(2)b. “The quarry inventory and sampling procedures will be conducted in accordance with written guidelines *1190 maintained by the Chief Geologist.” Id. (emphasis added). Then,
[t]he Engineer of Tests will process and test the ... samples to determine if each bed is in compliance with the specified requirements for Class I and Class II Aggregate____ The Engineer of Tests will prepare and distribute a listing showing the approved Class I and Class II beds for each quarry----Inclusion on the approved listing requires 2 consecutive passing Production Samples representing current production from beds meeting the Class I or Class II requirement .... Exception to this process will require approval of the Chief of Materials and Research.
Id. § 5.02(c)(2)c (emphasis added).
In light of these provisions, it’s clear that inclusion of a quarry bed on the Approved List isn’t left to KDOT’s discretion.[8] After all, the Standard Specifications speak in terms of procedures that “will be conducted in accordance with written guidelines,” id. § 5.02(c)(2)b (emphasis added), and require testing to determine “compliance with the specified requirements,” id. § 5.02(c)(2)c (emphasis added). By adopting these Specifications, KDOT has severely limited its broad statutory discretion; if a quarry has two consecutive passing samples meeting the technical substantive requirements in the Standard Specifications, KDOT must include the quarry on the Approved List. See id.
B. KDOT’s procedure for removing a quarry from the Approved List
Just as KDOT has adopted rules and specifications limiting its discretion with respect to inclusion of a quarry on the Approved List, it has adopted rules and specifications similarly limiting its discretion to remove a quarry from the list once that quarry has been prequalified. Specifically, Part V provides that “[a]fter a quarry has been prequalified ... the prequali-fied status will continue as long as no major changes are made in the production process or occur in the deposit characteristics.” Id. § 5.02(c)(5) (emphasis added); see also Std. Specs. § 1101.4 (“Approved sources remain approved only if there are no major changes in the production methods or deposit characteristics.”). “Changes in deposit characteristics may be discovered either visually or through test results performed on Production Samples.” Part V § 5.02(c)(5).
Importantly, the meaning of the term “major changes” is not left to KDOT’s discretion. Rather, a “major change” occurs if (1) a mining operation moves a “significant distance from where the last inventory inspection was made”; (2) “significant changes are observed in the deposit characteristics”; (3) it has been two years since an active quarry was last rein-ventoried; or (4) “a production sample fails.” Id.
Only one provision, Part V § 5.02(c)(5), arguably stands in tension with these non-discretionary provisions. It states, “When any party feels that any change in the prequalified status of a quarry is warranted they should notify the DME responsible for quarry inspection who in turn will advise the Chief of Materials and Research,” who will then “review all available information on the changed conditions and render a decision on any such changes.” Id. (emphasis added). Both KDOT and the *1191 majority rely, at least to some extent, on Part V § 5.02(c)(5) to conclude that KDOT’s discretion is sufficient to destroy Martin Marietta’s property interest. For the reasons discussed below, § 5.02(c)(5) just isn’t capable of that kind of heavy lifting.
First, KDOT suggests that § 5.02(c)(5) gives it discretion to remove from the Approved List any quarry that, “in its judgment, does not produce a product of sufficient quality.” See Aplee. Br. 38-39. But interpreting Part V § 5.02(c)(5) to allow KDOT to remove a supplier from the list for any reason whatsoever is inconsistent with the provisions discussed above, which specifically provide that a quarry’s “prequalified status will continue as long as no major changes ” — which are specified in Part V and which do not apply here — “are made in the production process or occur in the deposit characteristics.” Part V § 5.02(c)(5) (emphasis added).
The majority, on the other'hand, concludes Part V § 5.02(c)(5) gives KDOT “discretion to reject aggregate if it has ‘reason to believe’ that the aggregate does not comply with the Contract documents, which include a variety of requirements beyond the Standard Specifications.” Maj. Op. 1181 (emphasis added). Even assuming the majority is correct, this interpretation renders § 5.02(c)(5) irrelevant to our discussion. The question here is whether KDOT retains discretion to remove a supplier from the list-not whether it retains discretion to reject aggregate.
Instead, the most natural and reasonable interpretation of the Part V § 5.02(c)(5) is that it permits “any party” to request that the Chief of Materials and Research verify that a quarry, once on the Approved List, continues to meet the requirements for inclusion on. that list as spelled out’’in the Standard Specifications. Thus, Part V § 5.02(c)(5)’s reference to “any change” refers back to the “major changes” specified in that section, which provides, “After a quarry has been pre-qualified ... the prequalified status will continue as long as no major changes are made in the production process or occur in the deposit characteristics.” Id. (emphasis added); see also Std. Specs. § 1101.4 (“Approved sources remain approved only if there are no major changes in the production methods or deposit characteristics.” (emphasis added)). This interpretation is not only internally consistent but avoids rendering the “major changes” provisions of Part V § 5.02(c)(5) and § 1101.4 of the Standard Specifications meaningless.
Thus, I would hold that KDOT has adopted rules and specifications which limit its discretion to remove a preapproved supplier from the Approved List.[9]
C. KDOT’s regulations governing the bidding and supply process don’t apply to Martin Marietta’s asserted property right
Finally, I can’t accept the majority’s attempt to liken Martin Marietta’s asserted property interest to that of a “disappointed bidder” or an incidental third-party beneficiary, both of which generally lack a property interest in a government contract. See Maj. Op. 1176-77, 1182. Nei *1192 ther analogy is apt. The disappointed-bidder cases the majority cites turn on an examination of the particular regulations governing the bidding process, all of which implicitly or. explicitly gave the government broad discretion in selecting the winning bid.[10] As discussed, that is not the case here. Similarly, any analogy to third-party beneficiaries of government contracts is also unpersuasive because it assumes Martin Marietta claims a property interest as a result of a provision in a contract between KDOT and a contractor. But Martin Marietta’s property interest claim doesn’t rely on the existence of a contract; it relies on the requirements detailed in the Standard Specifications. Privity isn’t a requirement in this circumstance.
Because KDOT has retained no discretion to exclude or remove a quarry from the Approved List so long as that quarry satisfies the Standard Specifications, I would hold that Martin Marietta has properly asserted a property interest protected by the Due Process Clause of the Fourteenth Amendment.
III. Martin Marietta hasn’t plausibly stated a liberty interest because it hasn’t challenged the district court’s defamation holding.
Martin Marietta also claims a liberty interest in its reputation, specifically a right not to be defamed by government officials in a manner that harms its ability to earn a living or damages its standing in the community. It alleges that by removing its quarries from the Approved List, KDOT announced to the industry that the Ottawa and Sunflower quarries could not be trusted to produce acceptable concrete. The district court dismissed Martin Marietta’s liberty interest claim, at least in part, because it held that Martin Marietta couldn’t establish a property interest.
The majority affirms the district court’s dismissal of Martin Marietta’s liberty interest claim on substantive grounds. But as KDOT points out, Martin Marietta hasn’t appealed the district court’s judgment with respect to the state law defamation claim. See Mem. & Order, Doc. 59, at 44-47 (dismissing Martin Marietta’s defamation claim for failure to state a claim because Kansas doesn’t recognize the tort of product disparagement); Aplee. Br. 51 (noting that “Martin Marietta has not appealed the district court’s determination that it does not have a valid defamation claim and that determination is now the law of the case.”).[11] Thus, because Martin Marietta hasn’t alleged an actionable defamation claim that could give rise to a protected liberty interest, I concur with *1193 that portion of the majority’s decision affirming the dismissal of Martin Marietta’s procedural due process claim based on an asserted liberty interest.

.See, e.g., Maj. Op. 1172 (“[W]e understand Martin Marietta to be claiming that it had a property interest to supply aggregate from Ottawa Quarry to KDOT and FHWA projects.” (emphasis added)); id. at 1172 (("[F]or Sunflower Quarry, we believe Martin Marietta is asserting that it had a property interest to supply aggregate to KDOT and FHWA projects.” (emphasis added))); id. at 1180 (“Martin Marietta points to no law, regulation, or Standard Specification provision that says that having prequalified status guarantees that a contractor will actually purchase and use its product." (emphasis added)); id. at 1181-82 (“Martin Marietta points to no law or regulation suggesting that it has a legitimate claim of entitlement to supply aggregate to KDOT projects.” (emphasis added)).

. See, e.g., Compl., Doc. 1, ¶ 45, at 12 ("Martin Marietta has a liberty and property interest in being on the A-Listing and in supplying limestone from its Ottawa Quarry to KDOT projects....” (emphasis added)); Proposed First Am. Compl., Doc. 31-1, ¶ 52, at 13 (“Martin Marietta has a liberty and property interest in being on the A-ListingtPQL and in supplying limestone from its Ottawa and Sunflower Quarries to KDOT projects____ (emphasis added)).

. See Mem. & Order, Doc. 59, at 29 ("[P]lain-tiffs are unable to allege a plausible claim of a protected property interest in remaining on the A-Listing/PQL or in supplying aggregate for concrete in KDOT’s on-grade pavement projects.” (emphasis added)).

. Further, in response to questioning at oral argument, Martin Marietta explicitly confirmed that its due process claim is based solely on remaining on KDOT's Approved List of aggregate suppliers. See Oral Arg. Trans, at 11:04-11:12 (responding to the question, "Are you saying there [are] two different property interests, there’s one combined property interest, what is your position?,” with, “Our property interest is being on the Approved List.”).

. See, e.g., Maj. Op. 1176 (“[Martin Marietta’s] argument must fail because it would result in a supplier being able to claim a constitutionally protected property interest in selling its aggregate to KDOT projects without KDOT having any ability to oversee the material quality.” (emphasis added)); id. at 1180 (“But KDOT's ability to reject the aggregate for other reasons — -project special provisions, material-test methods, material-test reports, or change orders — demonstrates that a supplier’s being on a preapproved list does not entitle it to sell its material or have that material actually accepted at the project site.” (emphasis added)); id. at 1181 ("[Pjrequalified status does not guarantee that Martin Marietta will actually sell its aggregate.” (emphasis added)); id. at 1182 ("And we rely not only on KDOT’s ability to reject aggregate at the project site but also on the basis that KDOT does not guarantee sales to any supplier simply because it is on a preapproved list.” (emphasis added)).

.The majority chides Martin Marietta for failing to distinguish between the Ottawa quarry's inclusion on the Approved List prior to 2013 and the Sunflower quarry’s inclusion on what the majority refers to as a "new” list after 2013. I find the majority’s insistence on referring to distinct lists confusing at best, since none of the parties have asserted such a distinction. In any event, the majority's distinction appears to be based on KDOT’s ability to change its specifications and create a new list with new specifications, which the majority suggests KDOT did in 2013. But as discussed infra, Martin Marietta doesn't dispute KDOT’s ability to change its specifications or even to create a new list with new specifications. See Aplt. Br. 23-24. Instead, it simply argues that KDOT not only lacks *1189 discretion to remove suppliers from the existing Approved List, but also lacks discretion to 'exclude suppliers from the Approved List in the first instance if the supplier meets the specifications. See Aplt. Br. 5-10. Thus, even assuming KDOT created an entirely new list in 2013, if KDOT lacked discretion to exclude a qualified supplier from that list, then the supplier has a property interest in inclusion on that list.

. Citations to Part V are to the 2007.version of the Manual, which is located at Doc. No. 59-4 of the district court docket.

. Indeed, the majority appears to concede that inclusion on the list is governed solely by objective criteria, not KDOT’s discretion. See Maj. Op. 1180 ("We agree with Martin Marietta that KDOT’s ability to retest the aggregate and reject it at the project site does not mean that a party's qualifying for a preap-proved list is governed, by anything but the Standard Specifications." (emphasis added)).

. KDOT suggests that it “could not perform its legislatively-mandated duties if [its] use of technical specifications was construed to prevent it from exercising discretion to remove materials that do not perform as required.’’ Aplee. Br. 56-57. Once again, this dire prediction misconstrues the issue and misstates the remedy sought. Nothing prevents KDOT from removing a supplier’s quarry from the Approved List if the quarry's aggregate no longer meets the criteria in the Standard Specifications, so long as the supplier is afforded due process (e.g., notice and a pre- or post-deprivation hearing) to contest the allegations.

. See, e.g., Glover v. Mabrey, 384 Fed.Appx. 763, 777 (10th Cir.2010) (unpublished) (holding no property or liberty interest in being prequalified bidder because prequalified bidder determination is subject to department of transportation’s sole discretion); S. Disposal, Inc. v. Tex. Waste Mgmt., a Div. of Waste Mgmt. of Tex., Inc., 161 F.3d 1259, 1265 (10th Cir.1998) (holding plaintiff had no property interest as a bidder to waste disposal contract because it was never guaranteed the contract); Curtis Ambulance of Fla., 811 F.2d at 1383 (holding plaintiff lacked property interest in contract for ambulance services when procedures provided that defendant "may” enter into a contract for professional services by competitive bidding); Interior Contractors, Inc. v. Bd. of Trs. of Newman Mem'l Cty. Hosp., 185 F.Supp.2d 1216, 1228 (D.Kan.2002) (holding Kansas competitive bidding statute requiring certain contracts to go to "lowest and best bid” doesn't confer property right to bidders because standard leaves broad discretion to decisionmaker).

. In its reply, Martin Marietta doesn't challenge KDOT's assertion that the district court’s defamation holding is now the law of the case. Rather, Martin Marietta simply reiterates its argument that it plausibly alleged defamation in its complaint. See Aplt. Reply • Br. 11-13.